# United States Court of Appeals
## For the First Circuit

---

No. 99-1180

KATHERINE M. O'NEILL,

Plaintiff, Appellant,

v.

CHARLES D. BAKER, in his individual capacity; LINDA K. CARLISLE, in her individual capacity; RUTH A. MCDERMOTT, in her individual capacity; COMMISSIONER OF ADMINISTRATION AND FINANCE OF THE COMMONWEALTH OF MASSACHUSETTS; and DEPARTMENT OF SOCIAL SERVICES OF THE COMMONWEALTH OF MASSACHUSETTS,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

---

Before

Selya, Boudin, and Lynch,
Circuit Judges.

---

Maura A. O'Neill for appellant.
Salvatore M. Giorlandino, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General of Massachusetts, was on brief, for appellees.

---

April 12, 2000

**LYNCH, Circuit Judge**.  The district court entered summary judgment against the claims of Katherine O'Neill, a veteran Massachusetts social worker, that the Department of Social Services (DSS) and her supervisors terminated her employment without affording her pre-termination rights to procedural due process.[1]  The complaint sought lost pay and benefits, compensatory damages, punitive damages, attorney's fees, and "such other relief the court deems just."  We affirm the grant of summary judgment.

## I.

Because this appeal challenges a summary judgment decision, we construct this description of the events from the undisputed facts and from inferences drawn in the plaintiff's favor.  See Thomas v. Eastman Kodak Co., 183 F.3d 38, 42 (1st Cir. 1999), cert. denied, 68 U.S.L.W. 3526 (U.S. Feb. 22, 2000) (No. 99-1127).  Katherine O'Neill was originally hired as a social worker by the Department of Public Welfare in 1975; she went to work for DSS in 1983 and was sent to the Chelsea DSS office in 1990.  O'Neill was a tenured employee under the Massachusetts civil service system and a member of the public employees' union, the Alliance of AFSCME-SEIU/AFL-CIO, Local 509.  At the time of her termination in 1993, she had the job title of Social

---

[1]     Her civil rights action was brought against DSS, Linda Carlisle, then DSS Commissioner, Charles Baker, then Commissioner of Administration and Finance of the Commonwealth of Massachusetts, and Ruth McDermott, the Area Director of the DSS's Chelsea office.  The three individuals, Carlisle, Baker, and McDermott, were sued in both their individual and official capacities.

Worker III and worked as a screener and investigator of allegations of child abuse and neglect.

Under state law, DSS must start to investigate and evaluate a report of a physically or emotionally injured child within two hours of initial contact and complete the investigation within 24 hours if there is reason to believe the child is in immediate danger. See Mass. Gen. Laws ch. 119, § 51B(1). Otherwise, the investigation and evaluation must be started within two days and completed within ten days. See id. The investigator's report becomes the basis for further actions, which can include taking the child into temporary custody, notifying the district attorney and creating a service plan for the child and family within 45 days, and/or making other social services available to the child and family. See id. § 51B(3)-(5). O'Neill's job involved her in the screening of the initial report and the later investigation.

O'Neill's work history reveals both considerable conflict with others in the Chelsea office and a series of complaints from her immediate supervisor about her absences from work and her failure to complete her reports in a timely manner. In July 1993, Ruth McDermott, the Area Director for the Chelsea office, met with O'Neill about her chronic tardiness and absences from work. O'Neill attributed these absences to a chronic illness that was exacerbated by the stress of her job. McDermott told O'Neill that she would continue to monitor her

absences.  At the same time, McDermott gave O'Neill a letter that detailed her absences and lateness, reminded her of the procedures for calling in late or sick, and notified her that failure to make "immediate and consistent improvement" would lead to "disciplinary action up to and including suspension."

O'Neill continued to be absent or tardy periodically, and on September 17, 1993, McDermott met with O'Neill and suspended her without pay for one day.  McDermott began the meeting by reading from a letter that listed her absences and tardiness, reminded her when she was expected to report to work, and warned her that the consequences of failing to make improvement included termination.  By memo dated October 6, 1993, McDermott advised O'Neill that while there had been some improvement, her performance and attendance record continued to be unsatisfactory.  McDermott urged O'Neill to "give more attention to these issues" and advised her that failure to make improvement would result in further disciplinary action "up to and including suspension."

On October 22, 1993, McDermott met with O'Neill and suspended her for three days without pay.  McDermott again handed O'Neill a letter at the beginning of the meeting and read from it. The letter detailed the days that O'Neill had been absent or tardy since the September suspension.  The letter further said that "any failure to make immediate and consistent improvement in the area's [sic] outlined above will result in you being terminated from your employment."

During most of this period, O'Neill was on a work plan designed to improve her performance. On November 3, 1993, O'Neill was informed that she was again being placed on a work plan (her last work plan had expired on October 31, 1993). The written work plan set forth DSS's requirements and expectations and warned O'Neill that failure to improve her attendance could lead to termination. McDermott repeated that warning to O'Neill on November 17, 1993.

On December 17, 1993, McDermott sent O'Neill a memorandum entitled "Contemplated Action Hearing." It instructed O'Neill to meet with her that day to discuss her attendance and work plan and, "[d]ue to the nature of the meeting," "advis[ed] [O'Neill] of [her] right to have Union representation." The meeting was rescheduled to December 20 and then to December 23 to permit O'Neill to have a union representative present.

On December 23, 1993, McDermott met with O'Neill and her union representative. McDermott read aloud from a letter of that date. The letter said that after review "of all the facts," including those presented at the meeting of December 23, there was just cause to terminate O'Neill's employment based on her continued pattern of tardiness and absences. It listed eight days since O'Neill's last suspension when she was absent or tardy for a period during the work day. McDermott's affidavit states that O'Neill did not, despite the opportunity provided at the meeting, offer any explanation for her

tardiness and absenteeism or any evidence that her discharge was not warranted.  McDermott's affidavit also says that "[h]ad [O'Neill] presented compelling reasons indicating that the contemplated discharge was unwarranted, [McDermott] would have reconsidered whether there was just cause to discharge her."  O'Neill, who also filed an affidavit, does not dispute this.

McDermott says that she decided to terminate O'Neill on December 17, 1993 and that she drafted the termination letter dated December 23 "prior to the hearing in consultation with the Department's labor relations office as was typical when a discharge was contemplated."  The termination letter was mailed to O'Neill the day before the termination meeting took place, and O'Neill received it at her home on December 24, 1993.  McDermott's affidavit says that it was a mistake for her secretary to have mailed the letter, which bore McDermott's signature, before the termination meeting.

The Massachusetts civil service law requires that certain particulars be followed before a tenured, covered employee like O'Neill is terminated.  See Mass. Gen. Laws ch. 31, § 41 (requiring that the employee be given written notice, "which shall include the action contemplated, the specific reason or reasons for such action and a copy of [certain] sections [of the civil service provisions]").  O'Neill says that she was not told in advance of the meeting that she was to be

terminated[2] and that she was not given a copy of the relevant civil service provisions, as required by the statute. Under the civil service law, O'Neill had the right to challenge her termination and the termination procedures in two ways. She could appeal within ten days to the Civil Service Commission, or she could bring a civil suit for reinstatement in state court. See Mass. Gen. Laws ch. 31, § 42.

Alternatively, under state law O'Neill could pursue her remedies under the collective bargaining agreement and take the matter to binding arbitration. See Mass. Gen. Laws ch. 150E, § 8. At the recommendation of her union representative, O'Neill decided to pursue arbitration. To do that, O'Neill waived her rights to appeal the discharge "to any other forum, including the Civil Service Commission."

At arbitration, the union did not deny O'Neill's absences and tardiness, but instead argued that many of these absences were justified by illness and that absences, tardiness, and flexible work hours were accepted practice at the Chelsea office. The arbitration resulted in a decision on March 29, 1996 that upheld the termination of O'Neill's employment as being amply supported by just cause. The arbitrator found that there was no evidence that any other Chelsea social worker had the "significant time and attendance problem" that

---

[2] We understand O'Neill, in light of the undisputed fact that she received the suspension letters that specifically warned of the possibility of termination of employment, to be saying that she did not receive prior explicit notice that the purpose of the December 23 meeting was to terminate her employment.

O'Neill had.  And she concluded that O'Neill's behavior adversely impacted DSS's ability to meet the statutory time requirements and thus to help children at risk and their families.  Noting some of O'Neill's strengths as a social worker, the arbitrator called this case "a very sad story."  We agree.

O'Neill made no effort to obtain judicial review of the arbitrator's decision, but instead filed a federal civil rights lawsuit on December 23, 1996.  The complaint, as amended, sought compensatory damages, punitive damages, attorney's fees, and "such other relief the court deems just."  In support of her claim for damages, O'Neill says that she was unable to obtain employment as a social worker in the two years between her termination and the conclusion of the arbitration. It was not until after the arbitral award that she retrained for employment in a different field.  In the interim, she exhausted her savings and lost her health insurance.  In addition, she claims that she was about one year away from vesting in the Commonwealth's retirement plan. From comments by her counsel at oral argument, it appears that, despite the fact that the termination was complete and upheld at arbitration, O'Neill thought this federal case would be a vehicle to obtain an injunction, which would have reinstated O'Neill to

her position at least long enough for her to vest in the retirement system.[3]

## II.

As in this court, O'Neill's arguments to the district court were a melange of different theories. On December 21, 1998, on a second summary judgment motion,[4] the court dismissed the claims pertinent to this appeal. The district court stated that O'Neill did not have a constitutional right to a pre-termination hearing "in these circumstances," that "the post-termination relief available to her under state law was constitutionally adequate," and that any challenge to the arbitral award was not properly before the court. We review the entry of summary judgment de novo, see National Foreign Trade Council v. Natsios, 181 F.3d 38, 49 (1st Cir. 1999), cert. granted, 68 U.S.L.W. 3345 (U.S. Nov. 30, 1999) (No. 99-474), and may affirm on any ground fairly presented in the record, see Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

## III.

---

[3] This is extremely doubtful on a procedural due process claim. See Carey v. Piphus, 435 U.S. 247, 259-64 (1978). It would make little sense to order an employee reinstated to a position -- from which it has been finally determined, in full post-termination proceedings, that she had been validly terminated -- because of a flaw in the pre-termination notice and opportunity to be heard.

[4] On January 8, 1998, the district court entered summary judgment on all claims against former Commissioner Baker. The plaintiff does not challenge that dismissal on appeal.

We quickly dispose of a number of the plaintiff's claims. O'Neill wisely chose not to appeal the district court's decision that the question whether the termination was supported by just cause was not before it, nor was review of the arbitral award. O'Neill's claim is clearly a procedural due process claim, not a substantive due process claim.

O'Neill also properly abandoned her claim for monetary damages against the individual defendants in their official capacities. Those claims are foreclosed by Will v. Michigan Department of State Police, 491 U.S. 58, 70-71 (1989). See also Wang v. New Hampshire Bd. of Registration in Med., 55 F.3d 698, 700 (1st Cir. 1995) (noting that "it is well settled 'that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action'") (quoting Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991)).

As to her claims for injunctive and monetary relief against DSS, they are barred by the Eleventh Amendment. The Supreme Court has clearly said that the Eleventh Amendment bars federal suits by citizens against the state or state agencies[5] and that this "jurisdictional bar

---

[5] O'Neill has made no claim that the DSS should not be considered an arm of the state for Eleventh Amendment purposes. Therefore, we assume that it is. See Fred v. Roque, 916 F.2d 37, 39 n.4 (1st Cir. 1990). Additionally, O'Neill has offered no evidence that the state has waived its immunity. See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 119 S. Ct. 2219, 2226 (1999) (setting forth the requirements for finding waiver).

applies regardless of the nature of the relief sought." <u>Pennhurst State Sch. & Hosp.</u> v. <u>Halderman</u>, 465 U.S. 89, 100 (1984). This does not mean that an aggrieved individual like O'Neill has no recourse: the Eleventh Amendment is not a bar to the naming of a state official, rather than the state or agency, as a defendant. <u>See</u> Erwin Chemerinsky, <u>Federal Jurisdiction</u> § 7.5, at 389 (2d ed. 1994). A plaintiff may, subject to a number of caveats, obtain injunctive relief against state officials and also, if she sues the officials in their individual capacities, recover monetary relief from them. Thus, we proceed to the claims made against the individual defendants.

O'Neill's claims against Carlisle, the former Commissioner of DSS, were properly dismissed. O'Neill's claims against Carlisle are premised on a respondeat superior theory, but such a theory cannot support a § 1983 claim against a supervisor. <u>See</u> <u>Monell</u> v. <u>Department of Soc. Servs.</u>, 436 U.S. 658, 691-93 (1978); <u>Bowen</u> v. <u>City of Manchester</u>, 966 F.2d 13, 20 (1st Cir. 1992). Instead, to hold a supervisory employee liable under § 1983, the plaintiff must show that the supervisor "possessed either the state of mind for the particular constitutional violation or deliberate indifference, and . . . played a causal role in plaintiff's constitutional deprivation." 1 Sheldon H. Nahmod, <u>Civil Rights and Civil Liberties Litigation: The Law of Section 1983</u>, § 3:91, at 3-241 (4th ed. 1999). McDermott's affidavit says that Carlisle was not consulted about this matter and did not order her to

-12-

take any actions regarding O'Neill's case.  In her answers to interrogatories, Carlisle insisted that she had no involvement in O'Neill's firing.  These statements are undisputed.  Therefore, there is no factual basis for a claim against Carlisle.

All that remains are the claims against McDermott.  It is undisputed that O'Neill's status, under state law, as a tenured civil service employee gave her a property interest in her employment that is protected by constitutional due process guarantees.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538-39 (1985); Cronin v. Town of Amesbury, 81 F.3d 257, 260 n.2 (1st Cir. 1996).  Thus, O'Neill was entitled to the constitutional minimum of "some kind of hearing" and "some pretermination opportunity to respond."[6]  Loudermill, 470 U.S. at 542 (internal quotation marks omitted).

The precise nature of her pre-termination procedural due process rights is important.  Loudermill held that a very limited hearing prior to termination was sufficient, provided that it was followed by a more comprehensive post-termination hearing.  See id. at 545-46.  The pre-termination hearing was to be "an initial check against mistaken decisions -- essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  Id.  The pre-

---

[6]     This is not an instance where the need for a pre-deprivation hearing is excused by "the necessity of quick action by the State." Parratt v. Taylor, 451 U.S. 527, 539 (1981).

termination process "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." Gilbert v. Homar, 520 U.S. 924, 929 (1997) (characterizing Loudermill).

The state procedures prescribed by chapter 31, sections 41-44 of the Massachusetts General Laws clearly fulfill the due process requirements for pre-termination notice and opportunity to be heard. And these requirements are appropriately reflected in DSS's Labor Relations Manual. Thus, O'Neill's real complaint is that these procedures were not followed in her case and that this failure to follow state procedures resulted in violation of her due process rights.

The defendants argue that O'Neill's claims against McDermott should fail.[7] First, they argue that O'Neill received all the process she was due under the Constitution. Second, they say that even if the pre-termination procedures were deficient, they were made so by the random and unauthorized conduct of state officials and remedied by adequate post-deprivation procedures.

A.   Pre-Termination Procedures and Due Process

Beginning with the defendants' first argument, the record shows that the pre-termination proceedings provided to O'Neill did not

_____

    [7]    In light of our holding, we need not examine the other arguments the defendants make in support of the grant of summary judgment.

deprive her of her due process rights.  Loudermill makes clear that the pre-termination hearing "need not be elaborate" as long as the "essential requirements of due process . . . [:] notice and an opportunity to respond" are provided.  Loudermill, 470 U.S. at 546. The letters and memoranda given to O'Neill in connection with her prior suspensions and work plans clearly put her on notice that termination could result if she failed to improve her attendance and tardiness. O'Neill was clearly provided notice of the final meeting on December 23, told the meeting was about her attendance and "[c]ontemplated [a]ction," and told she had a right to have a union representative there "[d]ue to the nature of the meeting."  Indeed, the notice told her the meeting was a "hearing."  And at the meeting itself, it is undisputed that the charges were clearly laid out and that O'Neill was given an opportunity to give her side of the story.  She had also been given the opportunity to respond on September 17, October 22, and November 3, when she was told that failure to improve her attendance could lead to termination.

O'Neill says that the essential due process requirements were not fulfilled because she did not have specific notice that the purpose of the December 23 meeting was to discuss her impending termination, because the decision to terminate her was made prior to the meeting, and because the termination letter was drafted, signed, and mailed

prior to the meeting.[8]  These facts, she says, deprived her of real notice and a meaningful opportunity to respond.  The plaintiff's argument is overstated.  First, there is no specific due process requirement that an individual know, prior to a contemplated action hearing, precisely what action is contemplated where there has been prior notice that termination could result if there were no improvement.[9]  The prior meetings and letters clearly provided O'Neill with notice of the charges DSS was making against her and she was plainly placed on notice that termination would be one of the actions to be contemplated at future meetings.  Further, the fact that O'Neill was advised of her right to have a union representative present and that the meeting was a hearing should have, in a practical sense, alerted her that this meeting would more likely involve more serious discipline than had the prior meetings.  Second, although McDermott

---

[8]     The latter two claims essentially amount to a "prejudgment" argument -- a claim that her case was improperly pre-judged, or decided without any opportunity for her to influence her employer's decision.

[9]     O'Neill may have a claim that some portions of the state law -- for example, the state law requirement that she be provided with prior notice of the action contemplated -- were violated in her case. Such claims, involving state procedural guarantees that are above and beyond constitutional due process requirements, are not properly before us. See Pennhurst, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); Roy v. City of Augusta, 712 F.2d 1517, 1522-23 (1st Cir. 1983) (analyzing a § 1983 claim and noting that "[m]ere violations of state law do not, of course, create constitutional claims").  Thus, we examine only those violations of state law that may have resulted in the deprivation of the plaintiff's due process rights.

acknowledges that she made the decision to terminate O'Neill and drafted the termination letter prior to the hearing, her testimony is uncontested that she would have "reconsidered whether there was just cause to discharge [O'Neill]" if O'Neill had offered "compelling reasons indicating that the contemplated discharge was unwarranted." There is no constitutional infirmity because the planned termination was subject to revision if O'Neill was able to contest the validity of the grounds for termination. Instituting termination proceedings and preparing the necessary documentation in advance of the final pre-termination hearing are not deprivations of due process rights. As to the premature mailing of the letter, the only evidence is that this was done in error. While unfortunate, the mailing of the letter neither impacted the timing of McDermott's decision nor the quality of O'Neill's opportunity to defend herself.

A more serious issue would arise if O'Neill had been deprived of a meaningful opportunity to say anything in her defense at the December 23 meeting (and the earlier meetings). But it is uncontradicted that O'Neill did have the opportunity to respond at each of the meetings, although she apparently did not take advantage of this opportunity at the December 23 meeting. It is possible that McDermott's reading of the letter, which said "it has been determined that there exists just cause to terminate you," at the beginning of the

meeting gave O'Neill the impression that any response would be futile.[10] Nonetheless, it is undisputed that O'Neill did have an opportunity to respond and that McDermott would have reconsidered the termination had O'Neill presented sufficient evidence.

In short, the record reveals no genuine issue of material fact as to O'Neill's prior notice of both her employer's dissatisfaction and the likelihood that severe consequences (possibly including termination) would follow if she did not do better. Similarly, the uncontradicted evidence shows that O'Neill (whether or not she exercised it) had a meaningful opportunity to speak in her own defense at a series of meetings, up to and including the meeting of December 23. Because the facts, even when viewed in the light most favorable to O'Neill, fail to make out a due process violation, the district court did not err in disposing of the claims against McDermott by way of summary judgment.

B. Random and Unauthorized Acts and Adequate Post-Deprivation Procedures

It is also reasonably clear that much, and possibly all, of O'Neill's due process claim against McDermott would be barred by the so-called Parratt-Hudson doctrine. See Parratt v. Taylor, 451 U.S. 527 (1981); Hudson v. Palmer, 468 U.S. 517 (1984). This court summarized

---

[10]    The better practice might have been not to start the hearing by reading the letter, but the Constitution requires only an initial check against erroneous decisions, not that the state follow best practices.

-18-

the doctrine in <u>Lowe</u> v. <u>Scott</u>, 959 F.2d 323 (1st Cir. 1992), as follows:

> When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the [Supreme] Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state.

<u>Id.</u> at 340. More recently, in <u>Herwins</u> v. <u>City of Revere</u>, 163 F.3d 15 (1st Cir. 1998), we said that there is "no denial of procedural due process, even by the official," where the prerequisites of random and unauthorized conduct and adequate post-deprivation remedies are met.[11] <u>Id.</u> at 19.

The <u>Parratt</u>-<u>Hudson</u> doctrine might have been undermined by the Supreme Court's later decision in <u>Zinermon</u> v. <u>Burch</u>, 494 U.S. 113 (1990), but this court has already rejected that view. <u>See</u> <u>Herwins</u>, 163 F.3d at 19. In <u>Herwins</u>, we viewed <u>Zinermon</u> as a case in which state law <u>did</u> authorize the procedure followed (albeit unconstitutionally), so that the act of the officials could not be described as "random and unauthorized"; <u>Zinermon</u> does, however, require that "courts scrutinize carefully the assertion by state officials that their conduct is 'random and unauthorized,'" <u>Lowe</u>, 959 F.2d at 341; and it is well to remember that the <u>Parratt</u>-<u>Hudson</u> doctrine is directed

---

[11]   The doctrine has been consistently applied in this circuit. <u>See</u> <u>Cronin</u>, 81 F.3d at 260; <u>Romero-Barcelo</u> v. <u>Hernandez-Agosto</u>, 75 F.3d 23, 33 (1st Cir. 1996); <u>Brown</u> v. <u>Hot, Sexy & Safer Prods., Inc.</u>, 68 F.3d 525, 535-37 (1st Cir. 1995).

only to claims that due process was denied and not to other kinds of constitutional violations. Nevertheless, the Parratt-Hudson doctrine plays an important part in allowing procedural claims to be resolved in state forums where states do provide adequate remedies.

In this case, it is reasonably clear that even if there was a lack of adequate notice, and we have held that there was not, it would at most amount to a random and unauthorized act. Indeed, state law clearly does provide for adequate notice, and there is no suggestion that either by formal or informal means the state has authorized the giving of inadequate notice to persons who may be terminated, or that this was any form of regular practice. Thus, that aspect of the claim would be barred by Parratt-Hudson even if there were more substance to the claim of a constitutional violation.

It is less clear whether this would be true of the "prejudgment" claim concerning the preparation of termination letters in advance; relying on McDermott's affidavit, O'Neill draws the inference that preparing termination letters in advance was a systematic and authorized internal procedure. Since we have concluded that the practice does not represent unconstitutional "prejudgment," we need not decide whether the Parratt-Hudson doctrine would bar this aspect of O'Neill's claim at the present stage or whether further factfinding and analysis would be necessary to decide whether Parratt-Hudson applies.

<u>Affirmed</u>.


- <u>Concurrence Follows</u> -

**SELYA, <u>Circuit Judge</u> (concurring in the judgment).** Having determined that the defendants' actions did not deprive the plaintiff of procedural due process -- a determination with which I agree -- the majority then proceeds, in the last four paragraphs of an otherwise exemplary opinion, to explain why those actions probably were random and unauthorized. Whether the majority's rumination is right, wrong, or somewhere in between -- a matter on which I take no view -- I object to the inclusion of these comments in the opinion for two reasons. First, they are wholly unnecessary to the result. Second -- and more important -- the status of the <u>Parratt</u>-<u>Hudson</u> line of cases, in the albedo of <u>Zinermon</u>, is at best uncertain. It would be one thing if the exigencies of Ms. O'Neill's appeal required us to enter that doctrinal swamp in advance of clarification by the Supreme Court. It is quite another thing to plunge gratuitously into it. Because I believe that we should refrain from such excursions, I respectfully disassociate myself from section III(B) of the court's opinion.