# United States Court of Appeals
## For the First Circuit

No. 04-2020

RUSSELL J. HADFIELD,

Plaintiff, Appellant,

JOSEPH M. PALOMBO; KEVIN DALTON; GEORGE B. MADSEN, JR.,

Plaintiffs,

v.

JOSEPH McDONOUGH, in his individual and official capacity
as Sheriff of Plymouth County; MATTHEW HANLEY, in his
individual and official capacity as Special Sheriff
of Plymouth County; CHARLES LINCOLN, in his individual
and official capacities; COLEMAN McDONOUGH, in his individual
and official capacities; JOHN P. REARDON, in his official
capacity as Commissioner of the County of Plymouth;
ROBERT J. STONE, in his official capacity as County Commissioner
of the County of Plymouth; PETER G. ASIAF, JR., in his official
capacity as  Commissioner of the County of Plymouth;
JOHN F. McLELLAN, in his official capacity as the Treasurer
of the County of Plymouth,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

---

        Ross D. Ginsberg with whom Richard D. Vetstein and Gilman, McLaughlin & Hanrahan, LLP were on brief for appellant.

        Kevin F. Moloney with whom Roger T Manwaring, Barron & Stadfeld, P.C., Thomas M. Hoopes and Kelly, Libby & Hoopes, P.C. were on brief for appellee Joseph F. McDonough.

        Kenneth H. Anderson with whom Thomas Drechsler and Finneran, Byrne & Drechsler, L.L.P. were on brief for appellees Matthew Hanley, Charles Lincoln and Coleman McDonough.

---

May 11, 2005

---

**HOWARD**, **Circuit Judge**.    In November 2000, Joseph McDonough defeated incumbent Charles Decas for the office of Plymouth County Sheriff.  Shortly after assuming office, McDonough fired Russell J. Hadfield from his position as Assistant Deputy Superintendent in Field Services for Training ("ADS for Training").  Hadfield brought this federal action claiming that the termination violated his constitutional rights.  He alleged that the Sheriff and three of his associates, Coleman McDonough, Matthew Hanley, and Charles Lincoln, unlawfully fired him on account of his support for Decas in the 2000 election.  He also alleged that the Sheriff and the Plymouth County Commissioners illegally denied him a hearing concerning his termination in violation of his due process rights.  The district court awarded all defendants summary judgment.  We affirm.

**I.**

We present the facts in the light most favorable to Hadfield.  See O'Neill v. Baker, 210 F.3d 41, 44 (1st Cir. 2000).  The Plymouth County Massachusetts Sheriff's Department has three primary responsibilities.  It operates the Plymouth County Correctional Center, provides support to local police and fire departments, and oversees the service of civil process and other legal documents.  The Department is headed by a popularly elected Sheriff and employs over 500 people.

Hadfield worked for the Department in various capacities from 1983 until his termination. In May 2000, Hadfield was made ADS for Training, a position in which he was supervised by the Department's Director of Training. Among his duties, Hadfield supervised instructors, developed resources, arranged classes, researched curricula, and taught various courses.

In the period before the November 2000 election, Hadfield worked for Decas' reelection. To help in the effort, Hadfield held Decas signs at various rallies. On November 4, 2000, on his way to a Decas rally, Hadfield passed a rally at which he noticed many people holding signs supporting McDonough. Hadfield attended this rally while holding a Decas sign. At the rally, Hadfield was approached by two of McDonough's supporters, Charles Lincoln and Coleman McDonough. After telling Hadfield that he should not be attending the rally, Coleman McDonough told Hadfield, "Bad move, Bubba, bad career move." In a similarly threatening vein, Lincoln told Hadfield, "You weren't even on the list. Now you're at the top of the list."

After McDonough took office in December 2000, he initiated a Department reorganization. As part of this process, he and his staff interviewed senior holdovers from the prior administration, including the Assistant Deputy Superintendents. Hadfield's interview took place in February 2001. Soon thereafter,

Hadfield received a letter from McDonough informing him that he was immediately discharged from his post as ADS for Training.

McDonough did not provide Hadfield with notice or a hearing before taking this action. After receiving the termination letter, Hadfield sent a written hearing request to the Plymouth County Board of Commissioners, which serves as the county personnel board. The Commissioners denied Hadfield's request. Hadfield did not appeal this decision to the Massachusetts state courts.

Instead, in April 2001, Hadfield filed this 42 U.S.C. § 1983 action claiming political discrimination in violation of the First Amendment and the denial of procedural due process in violation of the Fourteenth Amendment. After a period for discovery, all defendants moved for summary judgment.

The discrimination defendants argued that Hadfield occupied a position for which political affiliation was a requirement and that he therefore was not entitled to bring a claim of unlawful political discrimination. See, e.g., Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (stating that the First Amendment protection against politically motivated discharges does not extend to positions for which political affiliation is an appropriate requirement). The due process defendants argued that Hadfield was not entitled to a hearing because he did not have a property interest in continued employment under Massachusetts law, and that, even if he did have a right to hearing, his due process claim is

barred by the so-called Parratt-Hudson doctrine.  See Parratt v. Taylor, 451 U.S. 527 (1981); Hudson v. Palmer, 468 U.S. 517 (1984) (stating that a federal procedural due process claim may not be based on the random and unauthorized conduct of government officials so long as the state has provided an adequate postdeprivation remedy).

In a brief order, the district court awarded summary judgment for all defendants.  The court agreed with the discrimination defendants that political loyalty was a legitimate job requirement for the position of ADS for Training.  As to the procedural due process claim, the court concluded that, even if Hadfield was entitled to a hearing, his federal rights were not violated because any deprivation of process to which Hadfield was entitled resulted from random and unauthorized conduct and the state provided adequate postdeprivation remedies.  This appeal followed.

## II.

### A.    Standard of Review

We review the entry of summary judgment de novo, viewing the record in the light most hospitable to the party opposing summary judgment.  See Padilla-García v. Guillermo Rodriguez, 212 F.3d 69, 73 (1st Cir. 2000).  We do not credit "conclusory allegations, improbable inferences, and unsupported speculation" in this analysis.  Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896

-6-

F.2d 5, 8 (1st Cir. 1990). Summary judgment is proper only if the record, read favorably to the non-moving party, reflects no genuine issues of material fact and the undisputed facts indicate that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

### B. Political Discrimination

We begin by considering whether the discrimination defendants met their summary judgment burden of demonstrating that the ADS for Training was a position for which political affiliation was an appropriate basis for dismissal.[1] As mentioned above, we perform this analysis by drawing all reasonable inferences in favor of Hadfield. But the question of whether a position is subject to political discharge is a legal question for the court, even if it presents a close call. See Flynn v. City of Boston, 140 F.3d 42, 44 (1st Cir. 1998); McGurrin Ehrhard v. Connolly, 867 F.2d 92, 93 (1st Cir. 1989).

The First Amendment right to association includes a qualified right to be free from discharge from public employment merely because of political affiliation. See Elrod v. Burns, 427 U.S. 347, 359-60 (1976). But the right does not extend to all public employees. See id. at 360. In Elrod, the Court recognized that the wholesale protection of public employees could undermine

---

[1]The defendants denied that, in fact, they dismissed Hadfield because of his political views but assumed that this is a trialworthy issue for purposes of their summary judgment argument.

-7-

representative government by forcing those who win elective office to employ individuals who disagree with the prevailing candidate's (and presumably the electorate's) goals. See id. at 367; Flynn, 140 F.3d at 46. To permit the prevailing candidate sufficient leeway to enact his or her programs, individuals in policymaking and confidential positions were held to be excluded from the prohibition against politically motivated discharges. See Elrod, 427 U.S. at 367 & 375.

Four years later, in Branti v. Finkle, 445 U.S. 507, 518 (1980), the Court reaffirmed the constitutional protection against patronage dismissals but expanded upon the "policymaker/confidential employee" test. The Court instructed that a public employee is not protected from a politically motivated discharge if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id.

After Branti, this court and others have engaged in the process of developing a somewhat evolving standard for identifying those positions that fit within the exception articulated by the Supreme Court. See Flynn, 140 F.3d at 45 (describing the "porridge" of general statements and tests that have been applied in the wake of Branti). We have tended to ask (1) if the position deals with issues over which there can be partisan differences and (2) if the specific responsibilities of the position resemble those

of a policymaker or other officeholder whose functions are such that party affiliation is an appropriate criterion for holding the post. See Galloza, 389 F.3d at 29. We have recognized, however, that deciding whether a position is protected from political discharge is not "a matter of inserting variables into a known equation." Id. Rather, it requires a court to look closely at the position to identify its inherent duties and then to make a judgment about whether the position is one for which political affiliation is an appropriate requirement. See Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 10-11 (1st Cir. 2001).

With that said, our cases do yield some general principles which help demarcate the line between protected and non-protected positions. In Flynn, we surveyed our precedents to conclude that "the cases have regularly upheld against First Amendment challenge the dismissal on political grounds of mid- or upper-level officials or employees who are significantly connected to policymaking." 140 F.3d at 45. We explained that an employee is not immune from termination merely because the employee "stands apart from partisan politics," is not the ultimate decisionmaker in the agency, or is guided in some responsibilities by technical or professional standards. Id. at 46. "It is enough that the

official [is] involved [in policy], if only as an adviser, implementer or spokesperson." Id.[2]

Application of our cases convinces us that political affiliation is an appropriate requirement for the position of ADS for Training. The Sheriff is involved in several areas which can be affected by partisan divisions. The Sheriff runs a prison and therefore must make numerous politically-influenced decisions about prison operations and the treatment of inmates -- some or many of which decisions could be the subject of partisan political contention. These decisions are embodied in Department policies and directives which are put into effect by Department employees working directly within the prison. These employees, in turn, learn about the new policies and directives primarily through training. The Sheriff's efforts to implement his agenda could therefore be frustrated by a training program which does not accurately reflect his views.

The ADS for the Training is a high-ranking employee in this politically important branch of the Department. According to

---

[2]These principles have led to rulings dismissing political discharge cases when brought by mid- to upper-level employees including a regional director of an administrative agency, the municipal secretary in a mayor's office, an officer in charge of human resources, a director of public relations, a superintendent of public works, and a director of a city's office of federal programs. See Flynn, 140 F.3d at 45. They have also yielded rulings permitting claims to proceed by lower-level employees including a cleaning supervisor and a career administrative aide. See id.

the formal job description,[3] the ADS for Training supervises and directs the training program for Department personnel; develops instructor resources; arranges for classes and seminars; researches curricula, methods, policies, and procedures pertinent to training; develops and administers evaluative testing; instructs certain training courses; coordinates use of department training resources; assures that instructors meet training certification requirements; and develops the training schedule based on the availability of personnel.

In our view, this job description demonstrates that the ADS for Training is an "adviser, implementer, [and] spokesperson" concerning Department policy. Flynn, 140 F.3d at 46. The position's duties include researching methods, policies and procedures related to training and developing instructor resources. These duties illustrate that the ADS for Training works independently to revise and improve the training program. Indeed, Hadfield acknowledged that he advised the Director of Training (to whom he reported) concerning proposed changes in training operations. There is no dispute then that the ADS for Training advises on training policy.

---

[3]We have observed that the job description is the best, and sometimes dispositive, source for identifying the functions of the position. See Duriex-Gauthier, 274 F.3d at 8; Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58, 64-65 (1st Cir. 1997).

The ADS for Training is also a policy implementer. Subject to only "general supervision," the ADS for Training "supervises and directs the training program" for his or her assigned program areas within the Department. Open-ended responsibilities are a telltale sign that the position includes a policy implementing function. See Galloza, 389 F.3d at 32; Duriex-Gauthier, 274 F.3d at 10.

Finally, the ADS for Training acts as an internal spokesperson for the Sheriff. The officeholder is responsible for instructing certain courses and supervising the instructors. In these roles, the ADS for Training acts as the Sheriff's spokesperson by representing the Sheriff's views to the rank and file and to his subordinate instructors. See Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 328 (1st Cir. 1987) (stating that a job requiring an officeholder to act as spokesperson for political official could not be done effectively except by one who shared the [official's] political beliefs). Hadfield acknowledges that he represented the views of the Sheriff as part of his duties.

The duties of the ADS for Training resemble other mid- to upper-level positions for which we have held political affiliation is an appropriate requirement. See supra n.2. For example, we held that the head of the Personnel and General Services Office in the Puerto Rico Office of the Ombudsman was a policymaking position. See Duriex-Gauthier, 274 F.3d at 10. We relied on the

-12-

position's open-ended responsibilities for "planning and supervision of personnel activities" and the fact that the officeholder reported to those in the upper echelons of the agency. Id. Similarly, in Flynn, we held that the associate director for field operations of the Boston Community Centers was not protected from a political discharge. 140 F.3d at 45. The duties of that position included overseeing several programs, acting as a liason to other agencies, and maintaining agency compliance with legal duties. See id.

Despite the policymaking or implementing duties inherent in the ADS for Training position, Hadfield contends that, in fact, he served in a primarily administrative role, and that the policy aspects of the training program were handled by the Director of Training. But the fact that Hadfield may not have been involved in such activities in the prior administration is of little significance. His job description could be read to encompass participation in policymaking and political affairs, and the Sheriff, in forming his new administration, could be frustrated by an ADS for Training whose view varied from the Sheriff's. A new administration should not be overly hamstrung in filling key positions with loyal employees simply because of the way the prior administration operated. See Galloza, 389 F.3d at 31 (stating that "the goal of the [Branti] analysis is not to shackle a new administration"). This is why the Branti analysis eschews reliance

-13-

on "what functions a particular occupant of the position may in fact carry out from time to time" in favor of focusing on "the essential attributes of the position." Id. at 30.

Moreover, as we have already stated, an employee is not protected merely because he is a "subordinate within [his] own office[]." Flynn, 140 F.3d at 45 & 46. It is sufficient that an officeholder is responsible for implementing policies that derive from partisan decisions made by others.[4] Id. at 46. "These major responsibilities mean[] that political disagreements [between the ADS for Training] and his politically appointed [superiors] could lead to less effective implementation of political goals."[5] Id. at

---

[4]Of course an employee who merely implements policy is not thereby converted into one for whom political affiliation is a reasonable requirement.

[5]Hadfield also argues that summary judgment should have been denied because a Massachusetts Supreme Judicial Court decision holds that the position of classification and treatment director within the Plymouth County Sheriff's Department was not a policymaking position because the position retained civil service protection under Massachusetts law. See Sheriff of Plymouth County v. Plymouth County Personnel Bd., 802 N.E.2d 71, 76 (Mass. 2004). Hadfield contends that because the "director" classification is higher than his "assistant deputy sheriff" classification, his position also cannot be deemed as policymaking. There are two flaws in this argument. Neither the SJC decision nor Hadfield has provided information concerning the duties which the classification and treatment director performs. Without a description of the position's duties, we cannot discern whether it involves the kind of functions which we have concluded qualifies Hadfield's position as one for which political affiliation is an appropriate requirement. See Flynn, 140 F.3d at 44 (explaining that in the Branti analysis "duties prevail over titles"). Moreover, the SJC's analysis equated the definition of policymaking with the position's civil service status under Massachusetts law. But the state law classification of a position is not determinative in the Branti

-14-

In sum, the evidence demonstrates that the ADS for Training is at or near the top of the Department's training program. The officeholder has broad power to advise policymakers, to implement policy, and to act as a spokesperson for the Sheriff to rank and file personnel. Because the training program is critical to the Sheriff's ability to implement his agenda, it is reasonable for the Sheriff to fill this position with an individual whom he believes is committed to his program. We therefore conclude that political affiliation is an appropriate requirement for the ADS for Training and that the district court correctly granted the discrimination defendants summary judgment on Hadfield's First Amendment claim.

### C.        **Procedural Due Process**

Hadfield alleges that the due process defendants violated his right to procedural due process by denying him a hearing concerning his termination. The due process defendants contend that Hadfield was not entitled to a hearing because he did not have a property interest in continued employment. They also argue that, even if they were wrong in this respect, the Parratt-Hudson doctrine bars Hadfield's claim.

Hadfield's claim depends on him having a property right in continued employment. See Bd. of Regents v. Roth, 408 U.S. 564,

analysis. See, e.g., Jimenez Fuentes, 807 F.2d at 246.

-15-

576-78 (1972). If he did, he could not be discharged without due process which, in the employment context, includes the right to a predeprivation hearing. See Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 538-42 (1985). Whether Hadfield possessed a property interest in his employment is a matter of Massachusetts law. See id. at 538

The due process defendants argue that Hadfield did not have a property interest in continued employment (and thus was not entitled to a hearing) because his employment was governed by Mass. Gen. Laws ch. 126, § 8A. This statute provides that any deputy superintendent appointed by the Sheriff for employment in the house of corrections serves at the pleasure of the Sheriff and is exempt from civil service protection. Hadfield counters that his employment was governed by Mass. Gen. Laws ch. 35, § 51 which provides covered employees with civil service protection. Under this statute, covered employees may not be terminated without receiving notice and a hearing from the appointing authority. In addition, they may appeal the appointing authority's decision to the county personnel board and, if still dissatisfied, to the state courts. As part of the appeal, an aggrieved employee may claim that he was denied the requisite process, including the complete denial of a hearing. See Puorro v. Commonwealth, 794 N.E.2d 624, 628 (Mass. App. Ct. 2003) (holding that deputy sheriff, who was terminated without a hearing, could, as part of an appeal under

-16-

Mass. Gen. Laws ch. 35, § 51, claim that he was denied a hearing because he was misclassified as a non-covered employee). A prevailing employee may obtain reinstatement and recover backpay.

Because we conclude that Hadfield's claim is barred by the Parratt-Hudson doctrine, we do not decide Hadfield's proper employment classification under Massachusetts law. We assume arguendo that Hadfield possessed a property interest in continued employment and the concomitant right to a hearing concerning his termination.

We have summarized the Parratt-Hudson doctrine as follows:

> When a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, the Supreme Court has repeatedly emphasized that the due process inquiry is limited to the issue of the adequacy of the postdeprivation remedies provided by the state.

O'Neill v. Baker, 210 F.3d 41, 40 (1st Cir. 2000) (quoting Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992) (alterations in O'Neill omitted). Parratt-Hudson shields a public entity from a federal due process claim where the denial of process was caused by the random and unauthorized conduct of government officials and where the state has provided adequate postdeprivation remedies to correct the officials' random and unauthorized acts. See Mard v. Town of Amherst, 350 F.3d 184, 193 (1st Cir. 2003); Brown v. Hot,

-17-

Sexy & Safer Prods., Inc., 68 F.3d 525, 536-37 (1st Cir. 1995).
The doctrine thus permits "procedural claims to be resolved in state forums where states . . . provide adequate remedies." O'Neill, 210 F.3d at 50.

Our cases establish that a government official has committed a random and unauthorized act when he or she misapplies state law to deny an individual the process due under a correct application of state law. See O'Neill, 210 F.3d at 50; Herwins v. City of Revere, 163 F.3d 15, 19 (1st Cir. 1998); Cronin v. Town of Amesbury, 81 F.3d 257, 260 (1st Cir. 1996) (per curiam); Brown, 68 F.3d at 536-37; Lowe, 959 F.2d at 344. In other words, conduct is "random and unauthorized" within the meaning of Parratt-Hudson when the challenged state action is a flaw in the official's conduct rather than a flaw in the state law itself.[6] See Herwins, 168 F.3d at 19 (stating that, but for Parratt-Hudson, "federal suits might be brought for countless local mistakes by officials in administering the endless array of state laws and local ordinances").

We have applied this doctrine in the public employment context. In Cronin, we rejected an employee's procedural due process claim because the claim was not directed at the

[6]Hadfield cites to cases from other courts which have taken a narrower view of "random and unauthorized conduct," see, e.g., Honey v. Distelrath, 195 F.3d 531, 533-34 (9th Cir. 1999), but acknowledges that we have adopted a broader view described above.

sufficiency of the statutorily provided pretermination procedures, but rather at the conduct of the government officials charged with implementing the procedures. 81 F.3d at 260 & n.2. Similarly, in O'Neill, we rejected an employee's procedural due process claim based on the failure of a state actor to provide an employee with the statutorily required pretermination notice. 210 F.3d at 50. We explained that "state law clearly provid[ed] for adequate notice and there [was] no suggestion that either by formal or informal means the state ha[d] authorized the giving of inadequate notice to persons who may be terminated, or that this was any form of regular practice." Id.; see also Learnard v. Inhabitants of Town of Van Buren, 182 F. Supp. 2d 115, 1124-25 (D. Me. 2002) (applying Paratt-Hudson and First Circuit precedent to reject an employee's procedural due process claim based on the denial of a hearing because state law provided that the employee had a property interest in continued employment).

Here, Hadfield was denied a hearing because the due process defendants erred (if they erred at all) by misapplying Massachusetts civil service law. This determination was not discretionary or governed by a formal or informal policy.[7] Cf. Zinermon v. Burch, 494 U.S. 113, 136-138 (1990) (holding that the

---

[7]Whether an employee is entitled to a hearing under Massachusetts law is a matter of statutory construction, not administrative discretion. See Hogarth v. Sheriff of Suffolk County, 564 N.E.2d 397, 398-99 (Mass. App. Ct. 1990).

-19-

<u>Parratt</u>-<u>Hudson</u> doctrine does not apply where the denial of predeprivation process resulted from the state-sanctioned discretion of the official to decide what process is necessary); <u>O'Neill</u>, 210 F.3d at 50 (stating that the doctrine may not apply when unlawful conduct is in accord with informal policy). Rather, if error, it was simply a misapprehension of state law. This is the sort of random and unauthorized conduct to which <u>Parratt</u>-<u>Hudson</u> applies. <u>See</u> <u>Herwins</u>, 163 F.3d at 19.

Having concluded that any deprivation of process was caused by random and unauthorized conduct by the due process defendants, we turn to whether Massachusetts law provided Hadfield with an adequate postdeprivation remedy. We have previously considered this issue under an almost identical Massachusetts statute. <u>See</u> <u>Cronin</u>, 81 F.3d at 260. In <u>Cronin</u>, we found that a Massachusetts civil service statute, which allowed a terminated employee to appeal the termination decision to the civil service commission and the state superior court (and, if successful, to obtain reinstatement and backpay) provided a sufficient postdeprivation remedy. <u>See</u> <u>id.</u> (discussing Mass. Gen. Laws ch. 31, § 44); <u>see</u> <u>also</u> <u>Herwins</u>, 163 F.3d at 19-20 (stating that administrative and judicial review is the "conventional regime" for remedying erroneous decisions by state officials and thus constitutes adequate postdeprivation process).

The statute at issue in this case is materially

indistinguishable, see Mass. Gen. Laws ch. 35, § 51, and therefore provided Hadfield with an adequate postdeprivation remedy for purposes of Parratt-Hudson. Hadfield chose not to pursue his postdeprivation remedy in state court, but there is no dispute that it was available to him. See Herwins, 163 F.3d at 19 (stating that it "makes no sense" to permit a plaintiff to pursue a federal due process claim after ignoring the "state provided procedural remedy"). Accordingly, the district court correctly awarded the due process defendants summary judgment.

## III.

For the reasons stated, the district court's judgment is **affirmed**.