# United States Court of Appeals
## For the First Circuit

No. 03-2658

BENITO GALLOZA, A/K/A BENITO GALLOZA GONZALEZ, ET AL.,

Plaintiffs, Appellants,

v.

NORMAN E. FOY ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

Before

Selya, Lipez and Howard,

Circuit Judges.

Nydia Gonzalez Ortiz, with whom Santiago & Gonzalez was on brief for appellants.
Teresa M. Seda Ramos, with whom Sánchez Betances & Sifre, P.S.C. was on brief, for appellees.

November 10, 2004

**SELYA**, **Circuit Judge**.  In this action, the plaintiffs, who once held identical appointed offices in the same government agency, claim that their ousters were rooted in politics and, thus, violated their rights under the First Amendment to the United States Constitution.  As a fallback, they also claim that the adverse personnel actions infringed property rights secured to them by the Due Process Clause of the Fifth and Fourteenth Amendments.  The district court brushed these claims aside and granted summary judgment in favor of the defendants.  The plaintiffs now appeal.  After careful perscrutation of the briefs and the record, we conclude that political affiliation is a permissible criterion for holding the positions at issue and that the plaintiffs lacked any constitutionally protected property interest in those positions.  Consequently, we affirm the judgment below.

The essential facts are uncontroversial.  In 1991, the Puerto Rico legislature established the Municipal Revenues Collection Center (familiarly known by its Spanish acronym, CRIM) to "collect, receive and allocate . . . public funds" generated primarily through municipal property taxes.  P.R. Laws Ann. tit. 21, § 5802.  Organizationally, CRIM maintains nine regional offices, each of which operates under the aegis of a regional administrator.  From 1993 through 2000, the New Progressive Party (NPP) controlled the central government of Puerto Rico.  At various times during the NPP's reign, CRIM's executive director appointed

plaintiffs-appellants Benito Galloza Gonzalez, Orlando Mas-Muñiz, and Luis Antonio Galarza-Pérez, each of whom had enjoyed a long and successful career as a bureaucrat, to serve as regional administrators.

The Popular Democratic Party (PDP) swept to victory in the November 2000 general elections. Subsequent thereto, CRIM's reconstituted board of directors named defendant-appellee Norman E. Foy as CRIM's executive director and defendant-appellee Euclides Martinez as deputy executive director. The new hierarchs requested the plaintiffs' resignations. When the plaintiffs balked, Foy discharged them from their regional administrator positions (although he reinstated them to the career positions that they previously had occupied). Foy then appointed others of his choosing to the newly vacated regional administrator positions. For purposes of this opinion, we assume that politics played a decisive role in these personnel moves (Foy and Martinez are members of the PDP, whereas the plaintiffs are members of the NPP).

The plaintiffs brought suit under 42 U.S.C. § 1983, arguing that (i) political affiliation is an inappropriate criterion for employment as a regional administrator of CRIM (and, thus, the defendants' actions in reliance on it constituted political discrimination), and (ii) each of them had acquired a property interest in the regional administrator's position (and, thus, the defendants' abrupt dismissals of them for partisan

political reasons abridged due process). The defendants' riposte was that (i) political affiliation is an appropriate criterion for the effective performance of a regional administrator's duties, and (ii) the position is one of "trust," statutorily committed to free selection and removal (and, thus, not one in which a job-holder can acquire a constitutionally protected property interest). In a thoughtful rescript, the district court accepted the defendants' arguments and granted summary judgment accordingly. Gonzalez v. Foy, 286 F. Supp. 2d 223 (D.P.R. 2003). This appeal followed.

We review the entry of summary judgment de novo, taking all disputed facts in the light most hospitable to the nonmovants (here, the plaintiffs) and drawing all reasonable inferences therefrom in favor of the nonmovants. Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). In conducting this tamisage, we do not consider "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Summary judgment is proper only if the record, read in this manner, reflects that no genuine issue of material fact exists and that the moving party or parties are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

Having erected the summary judgment framework, we move to the plaintiffs' political discrimination claims. The First

Amendment protects associational rights. Incorporated within this prophylaxis is the right to be free from discrimination on account of one's political opinions or beliefs. LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996). This protection extends to matters of public employment: as a general rule, a government employer cannot discharge public employees merely because they are not sponsored by or affiliated with a particular political party. Elrod v. Burns, 427 U.S. 347, 350 (1976).

Like most general rules, this rule admits of certain well-defined exceptions. One such exception is reserved for instances in which political affiliation is an "appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518 (1980). This exception helps to ensure that elected representatives will not be hamstrung in endeavoring to carry out the voters' mandate. See Elrod, 427 U.S. at 367. Policies espoused by a new administration, presumably desired by the citizens whose votes elected that administration, must be given a fair opportunity to flourish.

In an effort to hold the balance steady and true between an individual employee's legitimate First Amendment right to freedom of association and a new administration's legitimate interest in implementing its civic policies, the Supreme Court has decreed that a public employer, as a prerequisite for discharging an employee for political reasons, must demonstrate that political

affiliation is an appropriate requirement for the position in question. Elrod, 427 U.S. at 362-63. This means, in effect, that the employer must show that the position is confidential or policymaking in nature. Id. at 367.

That may be more easily said than done; determining whether a position is "confidential" or "policymaking" is not a matter of inserting variables into a known equation and crunching the numbers. See, e.g., id. at 367 (acknowledging that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions"); Vazquez Rios v. Hernandez Colon, 819 F.2d 319, 324 (1st Cir. 1987) (noting that "[c]onfidentiality has many facets" in this context). Nor can the question be resolved by the simple expedient of examining the government's classification of a particular position (although that taxonomy may be entitled to some weight). See Branti, 445 U.S. at 518; Jimenez-Fuentes v. Torres Gaztambide, 807 F.2d 236, 246 (1st Cir. 1986) (en banc); see also Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 3 (1st Cir. 1987) (warning that this court, in determining whether political affiliation is an appropriate job requirement, has "resisted rigid use of labels"). When all is said and done, the determination as to whether a particular office is policymaking or confidential in nature, so as to make political affiliation an appropriate requirement for holding it, is fact-specific.

This case involves positions that, according to the defendants, have sufficient policymaking implications to avoid the constitutional proscription against politically motivated discharges. To test that representation, we employ a two-pronged analysis. The first prong, derived directly from Branti, 445 U.S. at 519, necessitates a high-level glimpse of the purpose of the employing agency and the role that the particular position occupies within it. Although conducted from the juridical equivalent of 50,000 feet, this reconnaissance should determine "whether the agency employing the plaintiff handle[s] matters potentially subject to partisan political differences," and should permit a tentative conclusion about the extent to which the particular position has the capacity to "influence the resolution of such matters." Mendez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1258 (1st Cir. 1987). This first prong is satisfied (that is, a position may be regarded, at least provisionally, as a policymaking position) as long as the position potentially "involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." Jimenez-Fuentes, 807 F.2d at 241-42.

As applied to putative policymakers, the second analytic prong aspires to actualize the potential of the particular position. This task necessitates a detailed examination into whether the specific responsibilities of the position sufficiently

-7-

resemble those of a policymaker or office-holder whose functions are such that party affiliation is an appropriate criterion for tenure. Id. "The nature of the responsibilities is critical." Elrod, 427 U.S. at 367.

To differentiate between policymakers and non-policymakers, we assay a wide array of factors, including the relative compensation level for the position, the technical expertise (if any) required to do the job, the extent to which the position involves supervision and control over others, the degree to which the position confers authority to speak in the name of higher-ups who themselves are policymakers, the influence of the position over programs and policy initiatives, and the public perception of what the position entails. See Jimenez-Fuentes, 807 F.2d at 242. We also factor into the mix the relationship of the position to elected officials, party leaders, and partisan politics. Id. Finally, "consideration should . . . be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." Elrod, 427 U.S. at 368.

This inquiry focuses not on what functions a particular occupant of the position may in fact carry out from time to time, but, rather, on the essential attributes of the position itself. See O'Conner v. Steeves, 994 F.2d 905, 911 (1st Cir. 1993); Jimenez-Fuentes, 807 F.2d at 242. Thus, if a formal job description exists, it is important for an inquiring court to look

to the specifics of that document.  See Jimenez-Fuentes, 807 F.2d at 242.  "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position."  Elrod, 427 U.S. at 368.

We emphasize that the goal of this two-pronged analysis is not to shackle a new administration in the legitimate pursuit of the policies that led to its electoral success.  In Flynn v. City of Boston, 140 F.3d 42 (1st Cir. 1998), we explained that "an employee is not immune from political firing merely because the employee stands apart from 'partisan' politics, or is not the ultimate decisionmaker in the agency, or is guided in some of his or her functions by professional or technical standards.  Rather, it is enough that the official be involved in policy, even if only as an adviser, implementer, or spokesperson."  Id. at 46 (citations and internal quotation marks omitted).  Those words color our examination of the present plaintiffs' political discrimination claims.

We turn now from the general to the specific.  Our task is to determine whether the regional administrator position within CRIM sufficiently relates to partisan political interests or concerns to warrant application of the policymaker exception.  We conclude that it does.

It is difficult to imagine a more politically sensitive issue than the collection and apportionment of taxes.  Taxation is

considered an inevitable concomitant of American life. Cf. Letter from Benjamin Franklin to Jean-Baptiste Le Roy (Nov. 13, 1789) in 10 The Works of Benjamin Franklin 409, 410 (Boston, Hilliard, Gray & Co. 1840) (positing that in the newly formed republic, "nothing can be said to be certain, except death and taxes"). The tax rate, the assiduousness of the collection process, and the distribution of the revenues generated will significantly impact the domestic agenda of virtually every municipal, county, and state government in the United States (not to mention the federal sovereign). Governments at every level rely upon tax revenues to fund programs and functions that serve constituent needs. Roads could not be maintained, drinking water made potable, or social services administered without a tax-driven revenue stream. In the idiom of the First Amendment case law, then, taxation is a "vital political issue," Jimenez-Fuentes, 807 F.2d at 243 — and one that is of special importance to those who harbor partisan political ambitions.

The agency, too, is politically sensitive. CRIM's responsibilities extend beyond collection and enforcement activities. For example, it is tasked with setting tax rates and allocating collected revenues to the various municipalities it serves. See P.R. Laws Ann. tit. 21, § 5802. While the mechanical process of collecting taxes, by itself, may not be subject to much political disagreement, the potential for partisan divergence

increases exponentially when an agency has the discretion to affect the assessment of taxes and the distribution of the amounts that are collected.

The role of the regional administrator is not inconsequential in this process. CRIM's regional offices are entrusted, inter alia, with the responsibility for implementing the policies set by CRIM's board of directors and executive director. The regional administrator is the head of each regional office. He or she speaks for the agency in that region and superintends its activities there. Given the political sensitivity of taxation and the role and status of the agency and its regional administrators, we conclude that the position is one that satisfies the first facet of the policymaker analysis.

We thus reach the second prong of the inquiry. At that stage, the issue to be resolved is whether the position resembles that of a policymaker, whose functions are such that party affiliation is a concinnous criterion for selection and/or retention. <u>Jimenez-Fuentes</u>, 807 F.2d at 242. In making this determination, what counts are the attributes inherent in the position — its duties and powers — as opposed to the work actually performed by a quondam holder of that position. <u>See</u> <u>id.</u>

As indicated above, a perusal of the job description for the position is the most useful starting point for determining the position's inherent attributes. <u>See</u> <u>Roland-Plumey</u> v. <u>Cerezo-</u>

<u>Suarez</u>, 115 F.3d 58, 62 (1st Cir. 1997); <u>Ortiz-Pinero</u> v. <u>Rivera-Arroyo</u>, 84 F.3d 7, 13 (1st Cir. 1996); <u>see</u> <u>also</u> <u>Mendez-Palou</u>, 813 F.2d at 1260 ("Whenever possible, we will rely upon [the written job description] because it contains precisely the information we need concerning the position's inherent powers."). Job descriptions with duties that are broad or open-ended generally allow for the latitude to exercise discretionary judgment (and, thus, tend to indicate that a position is policymaking in nature). <u>Roland-Plumey</u>, 115 F.3d at 62. Conversely, job descriptions with duties that are narrowly circumscribed or rigidly delimited generally inhibit freedom of action (and, thus, tend to indicate that a position is not policymaking in nature). <u>Id.</u>

The official job description for the regional administrator position lists twelve main areas of responsibility.[1] Taken in the ensemble, this compendium strongly suggests that the position is one in which political affiliation is an appropriate criterion for employment. A regional administrator's duties involve, among other things, the planning and supervision of all administrative activities of the regional center; the oversight of personnel; the establishment of work methods to implement CRIM's objectives; the giving of advice to mid-level supervisory personnel in matters such as drawing up work plans; the channeling of complex

_____

[1]For ease in reference, we attach the official job description as an appendix to this opinion.

cases; and representation of the agency at various types of local assemblies, meetings, and conferences. In addition, the position vests the holder with the authority to determine what appraisals shall be made within the region, the power to resolve taxpayer problems (including the right to override preliminary determinations of the field staff or mid-level supervisors), the responsibility of maintaining relationships with the mayors of the affected municipalities in order to facilitate the performance of CRIM's work, and the duty of integrating CRIM's policies with the contribution needs and priorities of each municipality.

These are not purely mechanical or ministerial functions. They illustrate the wide sweep of discretionary powers inherent in the position of regional administrator. The responsibilities of a regional administrator, in CRIM's organizational structure, are not narrowly circumscribed, but, rather, are open-ended; they afford the position's occupant considerable leeway for discretionary policymaking and policy implementation.[2] As the district court perspicuously noted, the performance of a regional administrator can affect the financial well-being of the communities within the

---

[2]If more were needed — and we doubt that it is — we find it compelling that the regional administrators are in the upper echelon of CRIM's employees in terms of compensation; indeed, the plaintiffs' pay increased anywhere from 150% to 200% after being elevated from their career positions to the regional administrator positions.

region and can enhance or diminish CRIM's public image. See Gonzalez, 286 F. Supp. 2d at 228-29.

The case law erases any lingering doubt. Although CRIM's regional administrator positions have not previously been the subject of reported First Amendment litigation, this court "ha[s] regularly upheld against First Amendment challenge the dismissal on political grounds of mid- to upper-level officials or employees who are significantly connected to policy-making." Flynn, 140 F.3d at 45. On this basis, we uniformly have classified analogous positions as involving policymaking. See, e.g., Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 10 (1st Cir. 2001) (holding that the personnel officer in Puerto Rico's Ombudsman's Office was a policymaking position, notwithstanding a number of "technical and administrative" duties, because its occupant was "responsible for the planning and supervising of . . . personnel activities" and the like); Ortiz-Pinero, 84 F.3d at 11 (concluding that the office of director of federal programs in an agency that obtained and administered federal funding for public works projects was a policymaking position); Ortiz Lebron v. Santiago Nieves, 813 F.2d 22, 26 (1st Cir. 1987) (holding that the position of regional director of the Puerto Rico Department of Natural Resources was policymaking in nature); Jimenez-Fuentes, 807 F.2d at 244 (holding to like effect anent a regional director of Puerto Rico's Urban

-14-

Development and Housing Corporation).  This case is cut from the same cloth.

Where, as here, the holder of a position is deeply involved in policy, even if only as an implementer or agency representative, no more is exigible to satisfy the Elrod-Branti analysis.  Taking into account the position's "relative pay, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders," Jimenez-Fuentes, 807 F.2d at 242 (citation and internal quotation marks omitted), we conclude that, for First Amendment purposes, a regional administrator in the CRIM hierarchy is a policymaker.

In an effort to blunt the force of this reasoning, the plaintiffs contend that CRIM's independence from the central government and the bipartisan makeup of its board of directors necessitate a finding that political affiliation is not an appropriate criterion for appointment as a regional administrator. We do not agree.

The legislature created CRIM on the understanding that the agency would be "independent and separate from any other agency or instrumentality of the Government of the Commonwealth of Puerto Rico."  P.R. Laws Ann. tit. 21, § 5802.  Although this language establishes CRIM as a separate and independent agency, nothing in

-15-

the statute declares that the agency is to be a political eunuch. In fact, the statute specifies that CRIM's board of directors shall consist of nine members, seven of whom are to be sitting mayors and two of whom are to be officials of the central government.[3] P.R. Laws Ann. tit. 21, § 5804. The seven mayors are elected by vote of all the incumbent mayors, but four of them must belong to "the party winning the greatest number of municipalities in the general elections immediately preceding." Id. § 5804(a). These members serve four-year terms, roughly coincident with the four-year term of the governor. Id. § 5804(c).

For present purposes, this scheme is informative in two respects. First, it makes party affiliation a conspicuously important integer in the decisional calculus and, thus, belies any desire on the part of the legislature to insulate CRIM from political influences. Second, even if one assumes, for argument's sake, that it is theoretically possible for the political affiliation of the majority on the board to differ from that of the leadership of the central government, this would simply shift the prevailing political agenda from one of the two major parties to the other. Whether or not the governor's party dominates the board of directors, some party will dominate it; that party will have an agenda; and the regional administrators will, therefore, remain

---

[3]These officials — the president of the Government Development Bank and the Commonwealth's commissioner of municipal affairs — are themselves patronage appointees.

deeply engrossed in matters of partisan political concern. Hence, we reject the plaintiffs' attempt to extricate this case from the mine-run of decisions applying the Elrod-Branti doctrine.

To sum up, a multifaceted analysis of the functions of CRIM, the attributes of the regional administrator's position, the plaintiffs' job descriptions, and the relevant case law persuades us that the position is open to patronage dismissals. Consequently, the district court did not err in entering summary judgment in favor of the defendants on the plaintiffs' political discrimination claims.

This leaves the plaintiffs' claims under the Fifth and Fourteenth Amendments. Those claims derive from an assertion that each plaintiff had acquired a property interest in his regional administrator's position, so that his dismissal — which took place without either a hearing or a statement of cause — was in violation of due process. These claims are groundless.

To be sure, the Constitution affords due process protections to public employees who possess property interests in continued public employment. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). But the Constitution does not itself create property rights. Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 350 (1st Cir. 1992). Rather, the question of whether a public employee possessed a protectable property interest in a particular job is governed by local law and the terms and

-17-

conditions of the employment arrangement.  See Ortiz-Pinero, 84 F.3d at 17; Rivera-Muriente, 959 F.2d at 352.

Puerto Rico law establishes two categories of public employees:  career and confidential.  P.R. Laws Ann. tit. 3, § 1349.  Confidential employees, sometimes known as trust employees, are "those who intervene or collaborate substantially in the formation of the public policy, who advise directly or render direct services to the head of the agency."  Id. § 1350.  Regional directors of agencies are expressly included within this taxonomy. Id. § 1350(4).  The plaintiffs, vis-à-vis the positions at issue here, are therefore confidential employees.[4]

That ends this aspect of the matter.  The plaintiffs admit that they ascended to the regional administrator positions by non-competitive appointment to positions designated by Puerto Rico law as trust positions.  Appellants' Br. at 4.  Unlike career employees, who are "selected strictly on merit and can be removed only for cause," Jimenez-Fuentes, 807 F.2d at 246, trust employees are, under Puerto Rico law, of "free selection and removal," P.R. Laws Ann. tit. 3, § 1350(8).  Thus, the holder of a trust position does not have a constitutionally protected property interest in

_____

[4]As mentioned earlier, each of the plaintiffs is also a career employee vis-à-vis the position to which he was returned after being ousted from his regional administrator's post.  The plaintiffs' career positions are not at issue here.

that position.  <u>See</u> <u>Ruiz-Roche</u> v. <u>Lausell</u>, 848 F.2d 5, 7 (1st Cir. 1988).  Accordingly, the plaintiffs' due process claims founder.

We need go no further.  Concluding, as we do, that the position of regional administrator within CRIM is one for which political affiliation is a valid criterion and in which the plaintiffs had no legitimate expectation of continued employment, we uphold the lower court's entry of summary judgment for the defendants.

**<u>Affirmed</u>**.

**APPENDIX**

ESSENTIAL FUNCTIONS OF THE POSITION

1.  PLANS, DIRECTS, SUPERVISES AND EVALUATES ALL THE ADMINISTRATIVE ACTIVITIES OF THE [REGIONAL] CENTER.

2.  ADVISES THE SUPERVISOR OF TAXPAYER SERVICES, CHATTELS AND REAL PROPERTY IN DRAWING UP WORK PLANS AND PROPER CHANNELING OF COMPLEX CASES.

3.  ESTABLISHES THE WORK METHODS WHICH WILL INSURE THE ACHIEVEMENT OF THE OBJECTIVES OF THE REGIONAL OFFICE.

4.  DETERMINES [REGIONAL] CENTER NEEDS AND OFFERS RECOMMENDATIONS TO MEET THE SAME.

5.  DRAFTS COMMUNICATIONS AND REPORTS RELATED TO THE FUNCTIONS WHICH S/HE PERFORMS.

6.  COORDINATES EDUCATIONAL PROGRAMS AND TRAINING SESSIONS WITH SUPERVISORS IN ORDER TO ACCOMPLISH THE PROFESSIONAL DEVELOPMENT OF EMPLOYEES.

7. PARTICIPATES IN GENERAL MEETINGS CALLED BY THE ASSISTANT DIRECTOR OF REGIONAL OPERATIONAL SERVICES TO FOLLOW THE DIRECTIVES FOR IMPLEMENTING WORK PLANS.

8. REPRESENTS THE REGIONAL OFFICE AT ASSEMBLIES, MEETINGS, CONFERENCES OR ANY OTHER TYPE OF ACTIVITY THROUGH DELEGATION BY THE ASSISTANT DIRECTOR OF REGIONAL OPERATING SERVICES.

9. ASSISTS DISSATISFIED TAXPAYERS FROM ALL BRANCHES (CHATTELS & REAL PROPERTY AND TAXPAYER SERVICES) WHO COME IN SEEKING ORIENTATION AT A HIGHER LEVEL.

10. KEEPS INVENTORY OF THE REGIONAL OFFICE'S PROPERTY.

11. KEEPS CUSTODY OF THE DOCUMENTS OF THE REGIONAL OFFICE.

12. DETERMINES NEEDS FOR MATERIALS AND EQUIPMENT AND SUBMITS REQUISITIONS.