Javier DIAZ–PEDROSA, et al. et al., Plaintiffs

v.

**PUERTO RICO POWER AUTHORITY,** et al., Defendants.

Civil No. 07–1680(SEC).

United States District Court, D. Puerto Rico.

May 21, 2008.

Frank E. Laboy-Blanc, Humacao, PR, for Plaintiffs.

Francisco A. Ojeda–Diez, Jose J. Gueits–Ortiz, Jose Enrico Valenzuela–Alvarado, Department of Justice, San Juan, PR, Marie L. Cortes–Cortes, Marie L. Cortes-Cortes, Llovet Zurinaga & Lopez, PSC, Hato Rey, PR, for Defendants.

## OPINION AND ORDER

SALVADOR E. CASELLAS, Judge.

Pending before the Court is Defendants' Motions to Dismiss (Dockets ## 12, 14 &

15), and Plaintiffs' Oppositions thereto (Docket ## 17 & 18). After reviewing the filings and the applicable law, Defendants' motions to dismiss (Dockets ## 12–15) will be **GRANTED.**

## Standard of Review

*Fed.R.Civ.P. 12(b)(6)*

To survive a Rule 12(b)(6) motion, Plaintiffs' "well-pleaded facts must possess enough heft to show that [they are] entitled to relief." *Clark v. Boscher,* 514 F.3d 107, 112 (1st Cir.2008). In evaluating whether Plaintiffs are entitled to relief, the Court must accept as true all of their "well-pleaded facts [and indulge] all reasonable inferences therefrom." *Id.* However, Plaintiffs must rely in more than unsupported conclusions or interpretations of law, as these will be rejected. *Id.* That is, "factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all allegations in the complaint are true." *Parker v. Hurley,* 514 F.3d 87, 95 (1st Cir.2008). Therefore, "dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan,* 513 F.3d 301, 305(1st Cir.2008). The Court "may augment the facts in the complaint by reference to documents annexed to the complaint or fairly incorporated into it, and matters susceptible to judicial notice." *Id.* at 305–306.

## Factual and Procedural Background

We recite the facts as alleged in the complaint, and draw all reasonable inferences in Plaintiffs' favor. We also draw facts from the exhibits incorporated to the complaint by the Plaintiffs. Plaintiffs are Javier Díaz–Pedrosa (hereinafter Pedrosa), his wife, Betzaida Díaz–Lozada (hereinafter Díaz), and their Conjugal Partner-

ship (hereinafter collectively referred to as Plaintiffs). Pedrosa is a professional pilot who, from 2003 until 2006, worked for the Puerto Rico Power Authority (PREPA), as Administrator of Aerial Operations. *See,* Docket # 1, p. 3. On July 31, 2006, he was demoted to a career position as warehouse supervisor which entailed a salary cut of approximately 40%. *See,* Docket # 1, p. 6. He alleges that his demotion was politically motivated and violated his constitutional rights under the First, the Fourteenth, and the Fifth Amendments to the United States Constitution. Therefore, he brought suit pursuant to 42 U.S.C.A. § 1983, the retaliation section of the Fair Labor Standards Act (FLSA), 29 U.S.C.A. § 215 & 216, and various state laws.

On 2003, Pedrosa was recommended to the Administrator position by Héctor Rosario (Rosario), PREPA's Executive Director at the time. Docket # 1, p. 3. He was first appointed to the position on May 16, 2003, on a temporary basis. Docket # 1, p. 3. Plaintiff signed a document whereby he agreed to PREPA's classification of the position as a trust position. Docket # 1, p. 3. On October 15, 2003, Plaintiff was permanently appointed to the position. Although Pedrosa alleges in his complaint that he never agreed to the **permanent** position as Administrator of Aerial Services (AAS) being a trust position, the documents annexed by him to the Complaint tell a different story. On November 23, 2003, Pedrosa signed a document accepting the offer to remain permanently in the AAS position, which was classified as a trust position. *See,* Docket # 1, Ex. 1, p. 16. Said document reveals that Plaintiff accepted the position subject to the *caveat* that PREPA had the right to freely remove him from it without cause. *Id.*

In addition, Pedrosa alleges that during the early years of his tenure with PREPA

he was approached by various unnamed high ranking employees and members of a political group within PREPA called "Energía Popular", who requested that he make monetary contributions to said organization. *See,* Docket # 1, p. 4. Plaintiff concedes that he "never publicly expressed his political affiliation." *See,* Docket # 1, p. 3. He also claims that he refused to participate in any political activity during working hours. *Id.,* at p. 4. On 2004, Rosario, who nominated Pedrosa to the AAS position, was replaced by Co–Defendant Edwin Rivera Serrano (Rivera), and his former supervisor, Mr. Wilfredo Pantojas, was replaced by Co–Dependant Luis F. Jiménez–Pagán (Jiménez). Plaintiffs' complaint is rather obscure as to the alleged participation of each defendant in the violation of Pedrosa's civil rights. However, we know, only from the Complaint's caption, that Plaintiffs are suing Rivera, Jiménez and PREPA.

Plaintiffs allege that on August 2005, that is, almost a year after Rivera and Jiménez took office, Jiménez told Pedrosa that his work would be meticulously overseen because there were other persons within PREPA who did not practice his political "postures" who were more deserving of his position. Docket # 1, p. 5. Thereafter, he argues that his duties were slowly taken away from him. *Id.* On July 31, 2006, Rivera informed Pedrosa that he would be summarily removed from the AAS position as PREPA did not have to justify his removal from the position because it was within the trust service. *Id.,* p. 6.

Although the record shows that the AAS position was in the trust service, Pedrosa argues in the complaint that the position was a *de facto* career position as it was highly technical in nature, required knowledge of the Federal Aviation Administration's (FAA) standards and familiarity with aircraft operation, among other technical tasks. He also claims that it did not require the formulation of policy, was not privy to confidential information, did not report directly to the Executive Administrator, and that he did not act as a communicator of the PREPA. Docket # 1, p. 6. Finally, he argues that the position was a politically neutral administrative position. *Id.* At pp. 6–7. In support of his contention that the position was a *de facto* career position which did not entail policy formulation, Pedrosa annexed to the complaint an official description by PREPA of the AAS position.

Defendants moved to dismiss the complaint on various grounds. PREPA argues that Pedrosa has failed to plead all the elements necessary to a section 1983 cause of action for political discrimination, or that, in the alternative, the AAS position was a trust position not protected from patronage dismissal; that Pedrosa had no property interest over said position, and, as such, his due process claim fails; that Díaz lacked standing to sue under section 1983; and that Plaintiffs' complaint does not plead enough to make out a claim under the FLSA. In turn, Co–Defendant Jiménez's motion to dismiss argued that Pedrosa's political discrimination claims against him was time-barred; that he was entitled to qualified immunity; that Plaintiffs had no right under the Fifth Amendment or the Equal Protection clause to the U.S. Constitution; and that any other supplemental state law claim should be dismissed without prejudice so that Plaintiff may re-file them in local court.

Plaintiffs opposed both motions. We will only discuss some of the arguments, as we find them dispositive.

## Applicable Law and Analysis

*Failure to plead a political discrimination claim*

██ Plaintiffs' only claim is that he was demoted to a career position with a

salary reduction of 40% because of political animus. As a general rule, "the First Amendment protects associational rights ... [and] the right to be free from discrimination on account of one's political opinions or beliefs." *Galloza v. Foy,* 389 F.3d 26, 28 (1st Cir.2004). In light of said protection, the general rule is that "a government employer cannot discharge public employees merely because they are not sponsored by or affiliated with a particular political party." *Id.* The First Amendment also protects against other adverse employment actions, such as demotions. *See, Marrero v. Molina,* 491 F.3d 1 (1st Cir. 2007). To establish a prima facie case of political discrimination, a plaintiff must show "that party affiliation was a substantial or motivating factor behind a challenged employment action." *Id.* at 9.

■ That is, "while plaintiffs are not held to higher pleading standards in section 1983 actions, they must plead enough for a necessary inference to be reasonably drawn." *Marrero,* 491 F.3d at 10. Plaintiffs' allegations in support of their First Amendment claim make it difficult to draw reasonable inferences to support such a claim. We explain. Plaintiffs first pled that although Pedrosa is a member of the Popular Democratic Party, he has never made his political affiliation known, *see,* Docket # 1, p. 3, an essential element of a political discrimination claim. However, he alleges that sometime during the first years of his tenure some unidentified persons required him to make contributions to Energía Popular, but that he refused. On 2005, when Rosario (who first appointed Pedrosa to the AAS position) was replaced by Rivera, and his former supervisor was replaced by Co–Defendant Jiménez, the latter allegedly told him that Pedrosa would be meticulously overseen because Jiménez thought there were other employees within PREPA more deserving of his

position who did not practice his political postures. At no point did Plaintiffs allege that Jiménez knew Pedrosa's political affiliation, nor that Jiménez was in any way related to the unidentified persons who had required contributions from him in the past. To the contrary, it can be reasonably inferred from Plaintiffs' complaint that the "high ranking" officers who had required him to contribute to the PPD during the first years of his tenure, were no longer in PREPA. We can infer this because of the appointment of a new Executive Director and a new Director of Administrative Services following the 2004 elections. Furthermore, the mere statement that Pedrosa's job would be meticulously overseen is not an adverse employment action.

■ Plaintiffs next allege that on July 31, 2006, almost a year after Jiménez's isolated statement, Pedrosa was summarily removed from the AAS position by PREPA's new Executive Director, Co–Defendant Rivera, and restated to a career position as warehouse supervisor. However, Plaintiffs never pled that Rivera's decision to demote him was politically motivated. He only states that "[h]e was told that inasmuch as [his job] was ... classified as a trust position, the Agency had unlimited power to destitute him." Docket # 1, p. 6. Drawing all reasonable inferences in Plaintiffs' favor, the complaint would, in the best of the scenarios, make out claim only for unjustified dismissal, not one politically motivated. Plaintiffs' complaint fails to make the necessary connection that Rivera's decision to demote him was related to Jiménez's statements in 2005 or otherwise motivated by political animus. "Merely juxtaposing [Plaintiffs' political postures against the defendants'] is insufficient, standing alone, to create a causal link." *Marrero,* 491 F.3d at 10. Although the Court could *sua sponte* fill the gap left by

Plaintiffs, and conclude that Jiménez and Rivera acted together, moved by political animus, to remove Pedrosa from his position—which Plaintiffs failed to plead—"it would be speculative to draw the forbidden inference from the range of possibilities." *Id.* at 10 (plaintiff's allegations that her political party was mocked and that she was badly treated at work and then demoted lacked sufficient allegations to conclude that her demotion could have been politically motivated.) We conclude that Plaintiffs' complaint failed to plead enough to show that Pedrosa's affiliation or lack thereof was a substantial or motivating factor in Pedrosa's demotion. *Id.* at 9.

*Pedrosa's demotion was allowed by the First Amendment*

There is also an alternate ground to deny Plaintiffs' political discrimination claim. PREPA argued in its motion to dismiss that even assuming *arguendo* that Pedrosa was dismissed because of his "political postures" as he claims, the undisputed record shows that the AAS position was within the trust service, and, as such, subject to patronage dismissal. In evaluating this argument, we take as true Plaintiffs' allegations in the complaint as augmented by the exhibits attached thereto.

Plaintiffs allege in the complaint that Pedrosa was appointed by the Executive Director to the AAS position on May, 2003, as a temporary employee, and that he agreed to the position being classified as confidential or in the trust service. *See,* Docket # 1, p. 3 & Docket # 5, Ex. 1, p. 8 (stating "this vacancy is within the trust service, as established by Article 4.2 of the [Personnel Regulations] . . . subject to free removal.") PREPA's official document nominating Pedrosa to the AAS position on May 2003, explained that the position was in the trust service, and was signed by Pedrosa who stated that he "made his

decision freely, intelligently, and without any intimidation." Docket # 5, Ex. 1, p. 8. Although Plaintiffs claim that the permanent position was not in the trust service, the Exhibit I to Plaintiffs' complaint show different. On November 18, 2003, Pedrosa signed a document which stated that the AAS position was within the trust service, as established in Article 4.2 of PREPA's Personnel Regulations. *See,* Docket # 5, Ex. 1, p. 16. He stated that he had read the document and accepted the AAS position, freely, with the understanding that it was within the trust service and subject to free removal. *Id.*

 Plaintiff now argues that PREPA's classification of the position as a trust position is overreaching because its duties were technical in nature and did not call for policy formulation, communicating on behalf of the agency and that there was no room for political disagreement. Enlightened by the record, we disagree with the Plaintiffs.

Assuming that Plaintiffs did plead enough to infer that Pedrosa's demotion was politically motivated, and that they established a *prima facie* case for political discrimination, the burden then shifts to the Defendants to "establish either a non-discriminatory reason . . . or that [Pedrosa] held a political position for which party affiliation constituted an appropriate qualification for continued employment." *Ortíz–Piñero v. Rivera–Arroyo,* 84 F.3d 7, 12 (1st Cir.1996)(internal citations omitted). This is the so called *Branti/Elrod defense. Id.* This defense is designed to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 12.

 In order to determine whether Pedrosa's position was political in nature requires an evaluation of the substance of

the duties inherent to the position. *Id.* The question is two-tier. First, we need to determine whether "the overall functions of the employee's department or agency involve decision making on issues where there is room for political disagreement on goals or their implementation." *Id.* This inquiry focuses on the Agency or Department for which Pedrosa worked. The next step is more intricate to the position itself, and requires an evaluation of "whether the particular responsibilities of the plaintiff's position, within the department or agency, resemble those of a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure." *Id.* Although this determination is fact-intensive, "the ultimate determination whether a government position is political presents a question of law for the court, rather than an issue of fact for jury resolution." *Ortíz–Piñero,* 84 F.3d at 12. It is by now clear beyond peradventure that PREPA's functions involve decision making on issues where there is room for political disagreement. "PREPA has a responsibility for matters of great public significance. The Authority was created to oversee the Commonwealth's development and utilization of water and energy resources [whose] principal mission is to ensure the delivery of electrical power to inhabitants of Puerto Rico." *Fontane–Rexach v. PREPA,* 878 F.2d 1493 (1st Cir. 1988). Therefore, the First Circuit has concluded that "the agency itself likely handles matters potentially subject to partisan political differences." *Id.* The Authority also "exercises broad powers in the implementation of the island's economic development policies . . . which is one of the most pressing political issues on the island." *Rodríguez–Burgos v. PREPA,* 853 F.2d 31, 35 (1st Cir.1988). Therefore, "[t]hat PREPA is engaged in what might

be termed a politically sensitive mission seems . . . self-evident." *Id.*

 As part of the second step the Court must "examine the plaintiff's job responsibilities in some detail to determine whether the position involved resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Id.* In conducting this inquiry, the Court must "focus upon the powers inherent in a given [position], as opposed to the functions [actually] performed." *Méndez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258 (1st Cir. 1987). Whenever possible, in determining the inherent responsibilities of a given position, the Court will rely upon the official job description because "it contains precisely the information [the Court] need[s] concerning the position's inherent powers and responsibilities. . . ." *Id.* at 1260.

The AAS position from which Pedrosa was removed entailed administrative work and the responsibility for the "administration, direction and supervision of the Authority's aerial operations." Docket # 5, Ex. IV, p. 2. According to PREPA's official description of the job, the AAS would "supervise employees with administrative functions in activities relating to the planning, coordination and administration of the Authority's aerial transportation and the services given by the Authority to other governmental and private agencies." *Id.* (Our translation). The AAS is also responsible for "advising the Authority's Administrator of the Electrical Operations Division as to the acquisition, disposal, and maintenance of the aerial equipment." *Id.* The official outline describes the position as one performed "under general supervision with a high degree of discretion and independent judgment." *Id.* This general description enables the conclusion that Pe-

drosa was a policymaker privy to confidential information.

A closer view into some of the specific functions delegated to the AAS is also consistent with our conclusion. The AAS is responsible for coordinating the aerial transportation services with "other officials of the Authority, and other governmental agencies and private entities." *Id.,* at 3. The AAS also provides information to and advises the Authority in relation to the FAA regulations; administers the operational budget; solves complaints raised by delegates from the different employee unions within the Authority; and keeps official interrelations with other governmental agencies, regulating agencies, and providers to ease the coordination of the Authority's aerial services. *Id.* The AAS is also responsible for ensuring the Authority's compliance with the norms and practices established by the Authority under the Quality and Loss Control System. *Id.*

These functions have been catalogued in the past by the First Circuit as potentially involving "a modicum of policymaking responsibility related to matters within the Authority that might be subject to partisan political dispute." *Rodríguez–Burgos,* 853 F.2d at 35. In *Rodríguez–Burgos,* the First Circuit concluded that PREPA's Head of Supplies could be said to be involved in policy making and subject to patronage dismissal because he supervised many employees, was responsible for making recommendations to upper management, implementing the Supply Division's budget, and had a high degree of autonomy, self initiative and self judgment. *Id.* at 36. The same is true here. Furthermore, Pedrosa had the ability to speak on the Authority's behalf before other governmental agencies, private entities and employees unions. The latter responsibility, and the budget implementation also made Pedrosa privy to confidential information.

*See, Rosenberg v. City of Everett,* 328 F.3d 12, 18 (1st Cir.2003)(stating that "in determining the second factor, we consider relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders."); *see also, Ortíz–Piñero,* 84 F.3d at 12 (same).

The document outlining the inherent duties of the AAS position, which was submitted by Plaintiffs along with their complaint, stands uncontested. A mere review of these functions reveal that the AAS position entails responsibilities were there might be room for political disparities between the AAS and PREPA's top officials. Also, the fact that the Authority catalogued this position as a trust position, although not dispositive, tends to support our conclusion. *See, Rodríguez–Burgos,* 853 F.2d at 36 (stating that "the classification of a position as in the trust service is 'particularly helpful in drawing distinctions between mid-to-upper government positions ....' "); *see also, Ortíz–Piñero,* 84 F.3d at 16 ("state laws identifying government positions as trust or confidential are not dispositive of the federal law question whether a particular position is political ... [but] are entitled to some deference.") Also, mid-to-upper-level officials or employees who are significantly connected to policy-making, like Pedrosa, are not protected from dismissals or demotions on political grounds. *Rodríguez–Burgos,* 853 F.2d at 32. As such, Pedrosa's political discrimination claim will be **DISMISSED with prejudice.**

*Due Process of Law: Lack of Proprietary Interest*

 PREPA also moves to dismiss Plaintiffs' due process claims because Pedrosa had no proprietary interest over the AAS position. We agree. In order to

establish a "procedural due process claim under section 1983, a plaintiff must allege first that [he] has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived [him] of that property interest without constitutionally adequate process." *Marrero*, 491 F.3d at 5. In turn, for Pedrosa to establish that he had a protected property interest over the position of AAS at PREPA, he needs to establish that he had a "legitimate expectation of continued employment [deriving] from a statute, a contract, or an officially sanctioned rule of the workplace." *Id.* Under Puerto Rico law "[u]nlike career employees, who are selected strictly on merit and can be removed only for cause, trust employees are ... of free selection and removal." *Galloza*, 389 F.3d at 34. Therefore, in Puerto Rico "the holder of a trust position does not have a constitutionally protected property interest in that position." *Id.* Because it is clear from Plaintiffs' complaint and its attachments that the AAS position was a trust position, Pedrosa had no legitimate expectation to remain in such position as he had no property interest over it and PREPA could remove him without just cause. As such, Plaintiffs' due process claim is also **DISMISSED with prejudice.**

### Díaz's 1983 claim and the FLSA claims

PREPA also moved to dismiss all of Díaz's claims under section 1983 because she lacked standing to sue for the violation of her husband's constitutional rights. It also argued that Plaintiffs' claims under the FLSA lacked merit. Because Plaintiffs acquiesced to the dismissal of Díaz's claims, and of the claims under FLSA, we will not discuss the merits of PREPA's arguments on this respect. Therefore, all of Díaz's federal claims, and Plaintiffs' claims under the FLSA, are hereby **DISMISSED without prejudice.**

### Equal Protection of the Law

 Co-defendant Jiménez also moved to dismiss Plaintiffs' Equal Protection claims arguing that they failed to plead a cause of action thereunder. "Under the Equal Protection Clause, persons similarly situated must be accorded similar governmental treatment." *Marrero*, 491 F.3d at 6. Therefore, in order for a plaintiff to prevail on an Equal Protection claim, he must allege facts indication that "compared with others similarly situated, [he] was selectively treated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* Because Plaintiffs have failed to even allege that other persons, similarly situated, were treated more favorably than Pedrosa due to impermissible considerations, they fail to implicate the Equal Protection clause. *Id.* at 6–7; *see also, Néstor Colón–Medina v. Custodio*, 964 F.2d 32, 45 (1st Cir.1992)(noting that when a plaintiff argues that he was treated differently in retaliation for his political ideas, there is an overlap between the First Amendment and the Equal Protection clause, and, in some circumstances, having access to a First Amendment claim, there is little basis to justify the application of equal protection analysis.) Therefore, in view of Plaintiffs' failure to plead a claim pursuant to the Equal Protection clause, these claims will be **DISMISSED without prejudice.**

### Fifth Amendment claims

Plaintiffs have agreed to the dismissal without prejudice of their claims under the Fifth Amendment. *See,* Docket # 18, at p. 9. Therefore, these claims are hereby **DISMISSED without prejudice.**

*Supplemental State Law Claims*

■ Finally, Co–Defendant Jiménez also argues that in the event all the federal claims are dismissed, the Court should abstain from exercising jurisdiction over the state law claims. Exercising jurisdiction over pendent state law claims once the federal law claims are dismissed is discretional. *See, Newman v. Burgin,* 930 F.2d 955, 963–964 (1st Cir.1991)(holding that "the power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit ... [and] the district court has considerable authority whether or not to exercise this power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity). Because we will dismiss all of the federal causes of action before the Court, in the interest of comity, the Court will also **DISMISS without prejudice,** all of Plaintiffs' state law claims.

**Conclusion**

In light of the above, Plaintiffs' claims for violation of their First Amendment rights and Due Process are **DISMISSED with prejudice.** Plaintiffs' claims pursuant to the Federal Labor Standards Act, the Fifth Amendment, the Equal Protection clause, and state law are **DISMISSED without prejudice.** Judgment will be entered accordingly.

**SO ORDERED.**