# United States Court of Appeals
## For the First Circuit

No. 05-1940

KRISTIN DOUGLAS, a/k/a Tina Beth Martin,

Plaintiff, Appellant,

v.

YORK COUNTY; YORK COUNTY SHERIFF'S DEP'T;
UNKNOWN DEFENDANTS DEPUTY SHERIFFS,

Defendants, Appellees,

YORK COUNTY SHERIFF,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, Chief U.S. District Judge]

Before

Boudin, Chief Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Thomas F. Hallett, with whom Thomas Hallett Law Offices was
on brief, for appellant.
Michael J. Donlan, with whom Verrill Dana, LLP was on brief,
for appellees.

December 28, 2005

**LYNCH**, <u>Circuit Judge</u>.   The question presented is whether a civil rights action brought in May 2002, for events thirty years before, was brought too late under Maine's statute of limitations, or whether the statute of limitations was tolled by the plaintiff's mental illness.

The plaintiff, Kristin Douglas, alleges that she was gang raped by male prisoners in the fall of 1971 when she spent 10 days in the York County Jail in York, Maine.  In the face of a clear statute of limitations problem, Douglas argues that at the time of the attack, and during a nearly twenty-five-year period thereafter, she was mentally ill within the meaning of the Maine tolling statute, Me. Rev. Stat. Ann. tit. 14, § 853.  Section 853 provides that if a person "is a minor, mentally ill, imprisoned or without the limits of the United States when the cause of action accrues, the action may be brought within the times limited herein after the disability is removed."  <u>Id.</u>  By judicial construction, the term "mentally ill" in the tolling statute "refers to an <u>overall inability</u> to function in society that prevents plaintiffs from protecting their legal rights."  <u>McAfee</u> v. <u>Cole</u>, 637 A.2d 463, 466 (Me. 1994) (emphasis in original).

The plaintiff brought two claims.  The first was under state law for "negligence or misconduct of [the sheriff] or his deputies."  The applicable statute of limitations for this state law cause of action is four years.  Me. Rev. Stat. Ann. tit. 14,

-2-

§ 851.  The second claim was brought under the federal civil rights laws, 42 U.S.C. §§ 1983, 1988.  Since there is no federal statute of limitations for federal civil rights actions, courts look to the state limitations period for personal injury actions.  See Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005) (citing Owens v. Okure, 488 U.S. 235, 240-41, 249-50 (1989)).  The Maine statute of limitations for personal injury actions is six years.  Me. Rev. Stat. Ann. tit. 14, § 752.  Thus Douglas would have to show that she was mentally ill within the meaning of § 853 until at least 1998 for the state law cause of action and 1996 for the federal cause of action.[1]

The district court granted the defendants' motion for summary judgment on the ground that a reasonable fact finder could not conclude that Douglas was mentally ill under § 853 at all points before 1996.  We affirm.[2]

---

[1] Douglas does not claim that she had periods where she was not mentally ill, and so we do not directly address how the Maine courts would deal with that situation, except to note that the Maine Law Court has held that "a party cannot avail himself of a succession of disabilities, but only of such as existed, when the right of action first accrued."  Butler v. Howe, 13 Me. 397, 402 (1836).

[2] We assume arguendo that Douglas was mentally ill when her cause of action accrued, which is a requirement of § 853.  See Dasha v. Me. Med. Ctr., 665 A.2d 993, 994-95 (Me. 1995) (tolling statute not available to plaintiff who was "not mentally ill when the cause of action accrued").  The district court here found that there was an issue of material fact with respect to this question. The defendants urge affirmance on the alternate ground that the district court erred in denying them summary judgment on this ground.  We decline to address the issue, since we affirm on the

-3-

## I.

We give the core facts, taking all reasonable inferences in favor of Douglas. In the fall of 1971, Douglas was arrested for traffic violations and spent ten days in the York County Jail. The jail allowed male trustee prisoners to have access to the keys to all the cells, including her cell. While she was incarcerated in the York County Jail, a trustee prisoner used his key to enter her cell and rape her, and then let in three other inmates to rape her as well; these rapes continued for three or four days.

After being released from jail, Douglas traveled to New York for an abortion. Her pregnancy was a result of the rapes. After the abortion, Douglas went to stay with a friend in Newton, Massachusetts, until after Thanksgiving of 1971. Douglas stole a car in Massachusetts and drove to Colorado, where she had spent some time earlier. Douglas got a job as a chambermaid in Aspen, Colorado, where she stayed until March or April of 1972. She then moved to California; on her way there, she stole another car and sold the one she had earlier stolen in Massachusetts. In California, Douglas was arrested for stealing clothes and food; she spent six months in the San Bernardino jail.

After she was released in 1972, Douglas drove to Vermont in a Jeep she had stolen in Arizona. In Vermont, she was arrested

_____

same basis as the district court -- that Douglas cannot show that she continued to be mentally ill within the meaning of the Maine tolling statute during the relevant time period.

-4-

for stealing a gun.  Upon her arrest, the authorities discovered the stolen car.  She pled guilty to both crimes and was sentenced to six months in local jail for theft of the gun and a maximum of six years in federal prison for theft of the Jeep.  Douglas spent time in three different federal prisons.  In each prison, she worked for the prison dentist as a dental assistant.  She also helped her fellow inmates fill out forms so that they could receive credit for time served.  Because of disciplinary problems, her sentence was extended.  All told, she spent five years in jail, from 1973 to 1978.

After her release in 1978, Douglas spent some time in San Francisco -- six months in a halfway home and then another four or five months in a shared apartment, where she held jobs and paid rent.  Sometime after September of 1979, Douglas moved to Austin, Texas, where she held a number of odd jobs, including as a paralegal at a legal aid clinic for two months and as a delivery person for an alfalfa sprouts farm for under a year.  In 1980, Douglas returned to California, where she would spend the next few years.  During this time she rented a succession of apartments in the San Francisco area and lived with roommates.  She began attending Alcoholics Anonymous meetings, which she continued to attend sporadically over the next ten years.

Douglas lived in San Francisco for part of this period.  She first took a part-time job at a vegetable warehouse, loading,

unloading, and moving vegetables. While working there, she obtained an emergency medical technician certificate from a community college. Then, for nearly a year in 1983 or 1984, Douglas worked at a transportation company, where she drove elderly people to various locations.

In the fall of 1985, Douglas began a one-year dental assistant program at the City College of San Francisco. She completed this program, and after doing fill-in work for a number of dentists, she began working as a part-time dental assistant for Dr. John Fairchild. She quit after less than a year because she was not making enough money. She then worked as an apprentice sheet metal worker for under a year, and then again as a dental assistant, this time with the University of California Dental School, for about a year.

Around 1990, Douglas moved to Marin County, California. She attended college classes in Marin; she also worked for Dr. John Johnson, an oral surgeon, for about two and a half years. She then left her job and did not pursue new employment as a dental assistant because she had been diagnosed with Hepatitis C, which precluded her from taking a position where she was in contact with other people's blood.

In 1993, the plaintiff moved in with a woman named Renie Lindley. After moving a few times around Northern California,

Douglas and Lindley moved to Hawaii, where they currently live. Douglas has paid and continues to pay rent to Lindley.[3]

On two occasions over the years, Douglas hired attorneys to aid her in pursuing legal claims. In 1992, Douglas hired an attorney to represent her in a worker's compensation claim. In 1994, she hired another attorney to assist her with the appeals process for her Social Security disability benefits. Douglas has maintained a checking account continuously since 1971, with the exception of the period she was in jail.

Douglas has received psychological treatment, off and on, since 1982, but has never been committed to a psychiatric hospital. In 1995, she was diagnosed with chronic depression by Dr. Hazem Hashem. She also was diagnosed by two separate doctors as suffering from bipolar disorder. She was later examined by expert witnesses, as described below.

## II.

This is the second time the case has been before this court. See Douglas v. York County (Douglas I), 360 F.3d 286 (1st Cir. 2004) (remanding the case).

To support her tolling argument, Douglas has relied heavily on the opinion of her expert, Dr. Diane Schetky, a forensic psychiatrist. Dr. Schetky conducted forensic evaluations of

_____

[3] The record does not contain any evidence of what Douglas has done in terms of employment and or education since 1993.

-7-

Douglas on October 15, 2000, November 13, 2000, and November 22, 2002, and relied on Douglas' medical and psychiatric record. Dr. Schetky diagnosed Douglas with "Bi-Polar Disorder with a current depression, Post-Traumatic Stress Disorder and Mixed-Personality Disorder, with borderline, dependent and anti-social features." According to Dr. Schetky's affidavit, Douglas' pre-existing depression was exacerbated by the rapes and "[s]he went on to develop typical signs of Post Traumatic Stress Disorder related to the rapes." Dr. Schetky concluded as follows: "It is my impression that only recently (2000), with the help of treatment of her depression and Post Traumatic Stress Disorder, has she been strong enough to contemplate bringing a lawsuit for the rapes. . . . Given Ms. Douglas' low level of functioning in general, it would have been impossible for Ms. Douglas to have gathered enough emotional and psychological strength to proceed forward in any type of lawsuit concerning the jail house rapes."

The defendants countered with an affidavit from their own expert, Dr. Carlyle Voss, a psychiatrist who examined Douglas in October of 2002 and reviewed Douglas' medical history. Dr. Voss stated: "Since the alleged rapes in 1971, Ms. Douglas' psychological disorders have not resulted in an inability to function in society in a way that prevented her from protecting her legal rights. This is most notably established by [her] holding several jobs after the alleged rapes, living independently, and

-8-

participating in a wide range of life activities." Dr. Voss' affidavit also states: "Ms. Douglas did not report any direct effect of the rapes on the pre-existing post-traumatic stress disorder beyond her own report of increased difficulty in sustaining intimate relationships."

The record is undisputed that Douglas could recall the rapes when interviewed by the two experts and that Douglas mentioned the rapes to others when she was in prison from 1973 to 1978. It is also undisputed that she told her family about the rapes soon after they occurred. The defense expert, Dr. Voss, focused on Douglas' cognitive awareness that she had been raped. By contrast, Dr. Schetky focused on what she called the overshadowing of Douglas' cognitive state by her emotional state. As a result, Dr. Schetky considered this situation not as one of repressed memory, but "suppressed memory"; by this she meant that Douglas' emotional state made it "difficult to take any action on the matter until recent years."

The magistrate judge initially found that Douglas could not show that she was mentally ill after the rape within the meaning of § 853 -- that she did not suffer from an "overall inability to function in society that prevents [her] from protecting [her] legal rights." McAfee, 637 A.2d at 466. The magistrate judge noted that Dr. Schetky's testimony focused on the plaintiff's inability to bring the instant lawsuit, but that the

-9-

McAfee standard required more -- a showing of "the overall inability to function in society, not just the inability to protect the legal rights that might be at issue in the instant case." The magistrate judge found that Douglas "demonstrated . . . an ability to function in society which, while certainly not approaching optimal or even perhaps average functioning, must be deemed sufficient to have permitted her to protect her legal rights." Indeed, the magistrate judge found it persuasive that on two occasions -- in 1992 and 1994 -- she had protected her legal rights and hired an attorney. In addition, the magistrate judge relied, inter alia, on the following: that Douglas had maintained a checking account through most of the period, made living arrangements and paid rent, found employment, and obtained certification as an emergency medical technician and a dental assistant after taking classes. The magistrate judge recommended dismissal of the case on limitations grounds.

On May 23, 2003, the district court, on review of the magistrate judge's recommended decision, granted the defendant's motion for summary judgment, though on different grounds than those relied on by the magistrate judge. See Douglas I, 360 F.3d at 289. The district court shifted the issue in the case, without giving Douglas notice or an opportunity to respond, from whether Douglas was mentally ill in the period after the alleged attack (the focus of the evidence and the magistrate's decision) to whether she was

mentally ill at the time of the alleged attack. Douglas moved for reconsideration, tendering new evidence supporting her claim that she suffered from mental illness at the time of the attack; the district court denied the motion. Douglas I, 360 F.3d at 290-91. We ruled that the district court abused its discretion, and remanded. Id. At that time, we declined defendants' invitation to affirm on the basis that the evidence "conclusively establishe[d] that Douglas was not so mentally ill that she could not have brought this lawsuit long before she did" because "the district court never reached [the] issue." Id. at 291.

After remand, the defendants immediately moved for summary judgment on the grounds originally relied on by the magistrate judge. No new evidence was presented by either side. The magistrate judge recommended that the motion be granted, incorporating by reference the reasoning of his earlier recommendation.

The district court denied the defendant's second motion for summary judgment, finding that, based on the evidence on the record at the time, there was a genuine issue of material fact as to whether Douglas was mentally ill during the relevant time period. The district court expressly noted, however, that this was "a close question and one that future factual results may affect." The case returned to the magistrate and the second phase of discovery proceeded.

At the end of discovery, the defendants moved a third time for summary judgment.[4]  This time, each side supported its argument with full evidence.  The defendants argued that Douglas failed to demonstrate that she was mentally ill within the meaning of § 853 during the relevant period of time after the rape.  The magistrate judge agreed and recommended that the defendants' motion for summary judgment be granted on this ground.  While there may have been an issue of material fact when the district court denied the defendants' second motion for summary judgment, the magistrate judge found that further discovery had uncovered additional evidence that made it clear there was no disputed issue of material fact as to the post-rape period.

The new facts relied on by the magistrate judge included the following.  Douglas was a licensed dental assistant for about five years in the mid- to late 1980s.  She had been hired by Dr. Fairchild after meeting Dr. Fairchild and his wife, and had no trouble performing her job.  As part of her job with Dr. Johnson, the oral surgeon, Douglas escorted patients into the surgery room and took their blood pressure.  During operations, Douglas

---

[4] Douglas responded with a motion to strike almost the entirety of the defendants' motion on collateral estoppel grounds. The magistrate judge denied the motion to strike, and Douglas wisely does not appeal this determination.  The defendants, in turn, argued that Douglas' action was barred by the doctrines of collateral estoppel, judicial estoppel, and laches.  The magistrate judge rejected these arguments, and the defendants do not appeal these determinations.

monitored patients' heart rates and raised any problems with the heart rates with Dr. Johnson. After surgery, Douglas gave the patients post-operation instructions. Further, the magistrate judge noted that Dr. Schetky had testified at a deposition that Douglas "had the ability to concentrate and retain information, to be tested on that information and obtain satisfactory grades, to put together a resume or employment application and get a job and to sit down, be interviewed by a person who hired her and be perceived as having the necessary skills to do the job." The magistrate judge noted that Dr. Schetky had explained that Douglas' hiring of attorneys on previous occasions "demonstrated her ability to . . . protect her legal rights in the workplace, but it did not help her with the social support needed to go through a lawsuit involving emotional trauma such as rape."[5]

The magistrate judge concluded that, "particularly given Dr. Schetky's deposition testimony that the plaintiff demonstrated her ability to protect her legal rights on two occasions during the relevant period by hiring lawyers," Douglas had "failed to offer evidence that would allow a reasonable fact finder to conclude that she suffered from an overall inability to function in society that

_____

[5] The magistrate judge also relied on Dr. Schetky's deposition testimony that she "believed, assuming that the court deemed her competent to enter a plea, that the plaintiff was competent to enter a guilty plea to a charge of motor vehicle theft in the early 1970s." Douglas attacks this factual finding as being unsupported by the record. It is unnecessary for us to resolve the issue because it would not change the outcome of this appeal.

prevented her from protecting her legal rights" during the period after the attack. The district court affirmed in full the magistrate judge's recommended decision and dismissed the case. Douglas appeals, arguing that granting the defendant's motion for summary judgment on the issue of tolling was inappropriate.

## III.

Under Maine law, the question of whether the statute of limitations is tolled by mental illness at all is a question of fact in cases in which a jury is available. Bowden v. Grindle, 675 A.2d 968, 971 (Me. 1996).

We review the district court's decision to grant defendant's motion for summary judgment on statute of limitations grounds de novo, construing the record in the light most favorable to the non-moving party. Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005). We will affirm if, based on our independent review of the evidentiary record, there is no genuine issue of material fact and the undisputed facts indicate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hadfield, 407 F.3d at 15.

Plaintiff's argument is that she has been continuously mentally ill from the accrual of the cause of action until some period within four years or six years of the date she filed suit in 2002, and that a reasonable fact finder could conclude in her favor. While plaintiff has not given a precise date, she argues

-14-

that the turning point -- when she was no longer disabled by mental illness -- did not come until 2000. She asserts what really are two different themes: (1) that the very marginality of the life she has led shows that she did not have an overall ability to function in society in a way that allowed her to protect her rights and (2) that even if she had some ability to function, as to the specific claim she asserts of rape, there was a question of fact about whether she had an overall inability to function in society that prevented her from protecting this specific right. Her psychiatrist expressly distinguished Douglas' ability to pursue her rights as to the cause of action for the rapes from her ability to protect her legal rights in other contexts. Her second theme, then, is that while she was aware all along that she had been raped, her mental illness, which predated and was exacerbated by the rapes, prevented her from acting to sue for those rapes, even if she was capable of protecting other legal rights.

As a federal court sitting in diversity, we try to apply our best understanding of the principles Maine has adopted. It is not our role to expand Maine law; that is left to the courts of Maine. See Jordan v. Hawker Dayton Corp., 62 F.3d 29, 32 (1st Cir. 1995).

No Maine case directly answers the question before us. We look to the background of the adoption of the McAfee test, the Maine Law Court's historical approach to both limitations and

tolling provisions, and analogous areas of Maine law. In combination, they lead us to the view that Maine would reject the tolling argument here.

A.      **The Tolling Statute and Interpretive Case Law**

The tolling statute, which has deep roots in Maine history, was amended in the 1950s and applies to four categories: minors, the mentally ill, the imprisoned, and those outside the limits of the United States when the cause of action accrues. In such instances, the action may be brought within the times limited "after the disability is removed." Me. Rev. Stat. Ann. tit. 14, § 853. In all of the other categories, save for the disability of mental illness, it will be fairly evident when the disability has been removed. The 1950s amendment substituted the phrase "mental illness" for the word "insanity." See McCutchen v. Currier, 47 A. 923 (Me. 1900) (quoting prior tolling statute). Neither side has provided us with any legislative history as to the reasons for this change.

The Maine Law Court has had little opportunity to address questions about the proper interpretation of the term "mental illness" in the tolling statute. It did adopt the McAfee test, stating that mental illness for the purposes of the tolling statute means "an overall inability to function in society that prevents

plaintiffs from protecting their legal rights."[6]  McAfee, 637 A.2d at 466.  There are no cases directly dealing with the configuration of facts that characterizes this case.

The tolling statute itself does not define "mental illness," nor does it provide any measure for evaluating when the disability of mental illness has been removed.  From case law, we know that the standards for determining mental illness for purposes of the tolling statute are not necessarily the same as when determining mental competence for the ability to marry and divorce, see Chasse v. Mazzerole, 580 A.2d 155, 157 (Me. 1990) (finding that the fact that a mentally retarded woman had married and divorced, standing alone, was not enough to show an absence of mental illness under the tolling statute), or to stand trial, cf. State v. Bowman, 681 A.2d 469, 471 (Me. 1996) ("A defendant may suffer from a mental disease or defect within the purview of [Maine's insanity defense statute] and remain competent to stand trial."), or to avoid appointment of a guardian, cf. Guardianship of Hughes, 715 A.2d 919, 925 (Me. 1998) (finding appointment of a guardian was proper when "mental illness prevent[ed] [person] from making responsible decisions in at least some areas of her life" (emphasis added)).  That is because, as Chasse says, "the legal standard of competency varies for different purposes."  580 A.2d at 157.

---

[6]  This test was first articulated in McAfee, and has since been adopted in Bowden, 675 A.2d at 971.

-17-

When the test was articulated in McAfee, 637 A.2d at 466, the Maine Law Court drew on decisions from other states, citing Smith v. Smith, 830 F.2d 11, 12 (2d Cir. 1987); Hildebrand v. Hildebrand, 736 F. Supp. 1512, 1514 (S.D. Ind. 1990); Hickey v. Askren, 403 S.E.2d 225, 229 (Ga. Ct. App. 1991); and Yannon v. RCA Corp., 517 N.Y.S.2d 205, 206 (N.Y. App. Div. 1987). The cases on which McAfee relies, to which we look for guidance, involve belated lawsuits alleging sexual abuse, where the plaintiffs sought to toll the statute of limitations based on repressed memories resulting from post-traumatic stress disorder caused by the sexual abuse. These other cases, however, interpret statutes providing for tolling only in cases of "insanity" or "mental incompetence," and not with "mental illness," the term used in the Maine statute. It turns out that this distinction does not help the party seeking tolling.

Smith, the lead case relied on by McAfee, involved whether the New York statutory tolling provision for "insanity" applied to a plaintiff alleging she had repressed her memories of childhood sexual abuse by her father. 830 F.3d at 12. The plaintiff's experts attributed the repressed memory to post-traumatic stress disorder. Id. Smith held that the term "insanity" did not apply to a person "claiming a mere post traumatic neurosis," but applied only to those "who are unable to protect their legal rights because of an over-all inability to

-18-

function in society."  Id.  Smith, in turn, relied on McCarthy v. Volkswagen of America, Inc., 435 N.E.2d 1072 (N.Y. 1982).

The term "mental illness" could easily have been read to be more generous toward tolling than the New York statute's "insanity" requirement.[7]  Indeed, it was important to the McCarthy court in reaching its result that the New York Legislature had declined to "broaden" the term "insanity" by replacing it with the term "mental illness."  435 N.E.2d at 1074-75.  Since the Maine legislature, by contrast, did choose to replace the term "insanity" with "mental illness," the Maine Law Court had a clear opportunity to interpret the amendment as being more liberal toward tolling. It has rejected such an interpretation.

Maine may have rejected a more liberal test for a reason articulated in McCarthy.  McCarthy expressly worried that a more liberal interpretation might "inappropriately expand the class of persons able to assert the toll for insanity and . . . weaken the policy of the Statutes of Limitation as statutes of repose."  Id. at 1075.  This is the same theme sounded by the Maine Law Court in Nuccio v. Nuccio, 673 A.2d 1331, 1334-35 (Me. 1996) (denying

---

[7] Similarly, the other cases cited by McAfee permitted tolling only when there was mental incompetence -- arguably a more restrictive term than "mental illness".  See Hildebrand, 736 F. Supp. at 1524 (holding that a sexually abused plaintiff did not meet the standard of being "mentally incompetent" where the evidence showed she could manage her ordinary affairs); Hickey, 403 S.E.2d at 228-29 (denying tolling based on "mental incompetency"); Yannon, 517 N.Y.S.2d at 206 (tolling statute of limitations for "insanity" of plaintiff).

equitable estoppel of statute of limitations in a repressed memory case). The choice of a more restrictive interpretation of the Maine statute belonged to the courts of Maine, and it binds us.

The parties have each relied on only one case applying the McAfee test, Bowden, 675 A.2d 968, but Bowden is of little assistance. In Bowden, the plaintiff filed suit three months after the statute of limitations had expired, seeking rescission of a deed she had conveyed to a relative soon after the death of her husband. Id. at 970. Applying the McAfee test, the Maine Law Court found sufficient evidence to uphold the trial court's finding after trial that the plaintiff's mental illness was sufficient to toll the statute of limitations.[8] Id. at 971-72. This is a different question than what evidence suffices to get to a jury on the question of tolling.

In another case applying the McAfee rule, the Maine Law Court has stressed that there must be evidence of "an overall inability to function in society," see Morris v. Hunter, 652 A.2d 80, 82 (Me. 1994),[9] and that a person could not be said as a matter

---

[8] That evidence included the plaintiff's worsening mental state after the death of her husband, such that she "became . . . suicidal," that "she could not think, remember or understand what was going on," that she "had difficulty cooking her own meals, leaving the house, and driving," and that she had been "hospitalized three times for psychiatric disorders." Bowden, 675 A.2d at 970-71.

[9] The facts in Morris were quite different from those presented here, and so it is of limited use. The case involved a legal malpractice suit based on the attorneys' failure to alert the

of law to meet the definition when plaintiff "although perhaps unable to make complex decisions without assistance, can do so if provided with time and a careful explanation," id. at 82.  The court gave as an example that the plaintiff had signed a settlement agreement for worker's compensation benefits in the relevant period.  Id.  This also reflects a narrow approach.

B.          **General Approach to Limitations and Tolling**

We look to the long history of statutory interpretation of other provisions of the Maine tolling statutes.  Under the pre-1900 versions of § 853, which permitted tolling only for "insanity," the Maine Law Court twice held that once the disability was removed the statute of limitations began running, regardless of whether there was a later period of disability.  "[I]f disability could be added to disability, claims might be protracted to an indefinite period," and this was unacceptable.  Butler v. Howe, 13 Me. 397, 402 (1836); see also McCutchen, 47 A. at 923 ("When the statute of limitations has once begun to run, it is not interrupted by a subsequent disability.").

---

plaintiff of the existence of medical malpractice claims before the limitations period had run out.  The attorneys' defense -- based on no evidence -- was that there was no harm because the statute of limitations was tolled due to the plaintiff's mental disability. 652 A.2d at 81-82.  The trial court granted summary judgment for the defendants.  The Maine Law Court reversed, finding that there was a genuine issue of material fact as to the plaintiff's mental disability.  Id.

Further, historically, Maine has held that relief under the statute "is afforded . . . only when the disability existed when the cause of action accrued." McCutchen, 47 A. at 923. If a disability does not exist at the time of accrual, tolling is unavailable.[10] Dasha, 665 A.2d at 994-95. This may be true even when it appears that the tort caused the disability to arise. McCutchen, 47 A. at 923.

The Maine courts have also been noticeably and consistently strict in interpreting the other aspects of tolling provisions. A key principle is that these exceptions to statutes of limitations must be narrowly construed. Dasha, 665 A.2d at 995-96. The Maine Law Court has said that when "[t]he legislature has explicitly outlined the contours of the statute of limitations" it leaves no "room for [the courts] to carve out an exception to these rules." Id. at 996.

Resort to analogy to related areas of law shows a similar strict approach. The Maine courts have not been receptive to quasi-tolling arguments about equitable estoppel of the limitations defense or to equitable tolling itself, where plaintiffs claiming repressed memories of childhood sexual abuse have tried to use those doctrines to escape the strictures imposed on statutory tolling. In McAfee itself, 637 A.2d at 465-66, in Harkness v.

---

[10] We assume for present purposes that there was a material issue of fact over whether plaintiff was mentally ill at the time of the rapes.

<u>Fitzgerald</u>, 701 A.2d 370, 372-73 (Me. 1997), and in <u>Nuccio</u>, 673 A.2d at 1334-35, the court rejected repressed memory claims as grounds for tolling, estoppel, or creation of a "discovery rule." We think the Maine Law Court is unlikely to be more generous to claims where the plaintiff in fact recalls the event, but asserts that her emotional condition "suppressed" her ability to act on it.

**C.        Evaluation of Douglas' Arguments**

Douglas' first theory -- that she has shown a question of fact about her overall inability to function in society that prevents her from asserting any legal rights -- is easily defeated. On this record, Douglas did function in general and did assert other legal rights.

Douglas' stronger argument is her second one -- that the <u>McAfee</u> standard should be read in reference to the <u>specific claim</u> made, here of rape, and not to whether she otherwise had an ability to function in society and to protect her <u>other</u> legal rights. There may or may not be support for this view in a sentence in <u>Chasse</u>. That case rejected defendant's argument that the mentally retarded plaintiff was not mentally ill within the meaning of § 853 because she had been married and divorced: "Such evidence . . . gives no indication that Chasse possessed sufficient competence to comprehend and exercise her legal rights <u>in the circumstances of this case</u>." 580 A.2d at 157 (emphasis added). The phrase may be nothing more than a recognition that one could marry or divorce

-23-

without necessarily being competent to function or protect one's legal rights. Douglas reads it for more; she focuses on the final phrase -- "in the circumstances of this case" -- to help make her argument that only the legal rights at issue in the present case are material for the second prong of the McAfee test. The defendants argue that that would be an unnatural reading of McAfee[11] and at tension with the first prong. In fairness, we think the Maine Law Court has never been asked or resolved the precise question.

Nevertheless, the Maine courts have consistently taken a narrow approach to this tolling provision and have consistently focused on the overall ability to function in society. As a federal court sitting in diversity jurisdiction we have no license to expand Maine law beyond its present limits. See Bucci v. Essex Ins. Co., 393 F.3d 285, 293-95 (1st Cir. 2005). Moreover, there is little reason to think the courts of Maine will suddenly shift to a liberal interpretation. Douglas' second theory requires that the overall inability to function portion of the test be minimized. We think Maine law does not permit this. Because Douglas' second

---

[11] McAfee presented a claim of repressed memory of childhood sexual abuse; but the case turned on the failure of the complaint to fairly notify the court and parties that plaintiff suffered from an overall inability to function in society which prevented plaintiff from protecting legal rights. 637 A.3d at 466-67. The court did not say that a tolling defense could not be stated in such sexual abuse cases, merely that claims of trauma and stress did not suffice. Id.

-24-

theory is premised on a broader view of the tolling provision at issue here than the Maine courts would be willing to recognize, the second theory must also fail.

We agree with the district court and the magistrate judge that no reasonable fact finder could conclude that Douglas was incapacitated from bringing her rape claim before 1996 (for the federal claims) or 1998 (for the state claims). One can accept Dr. Schetky's psychiatric testimony that Douglas lacked the emotional and psychological "strength" to proceed in a lawsuit to address the rapes. Against the evidence of her life as a whole, this assessment is simply not enough to establish the mental illness disability. Douglas remembered the rapes and told other people about them, and thus confronted the rapes in several conversations with others well before 1996. This demonstrates an ability to deal with the fact that she had been raped. That her psychiatrist opined she lacked the strength to take the further step of suing is simply not enough against the entire record of background evidence showing she did function in society to protect herself and her legal rights. Douglas was reasonably self-sufficient throughout the period in question, maintaining employment and paying rent, and hiring counsel twice to protect her rights. She took action to improve her lot by attending AA meetings for a decade and completing two courses of study. Indeed, given Douglas' history,

the story of her redeeming her life and becoming responsible is independently praiseworthy.

Statutes of limitations serve important purposes, including those of repose and fairness. Maine's allowance for fairness to the mentally ill in its tolling provision simply cannot be stretched so far as to toll Douglas' claim.

Given the approach that the Maine courts have taken in the past to Maine's statute, the judgment of dismissal is **affirmed**. No costs are awarded.